764 A.2d 318

**HOLLINGSWORTH & VOSE COMPANY, et al.**

v.

**Charles M.P. CONNOR.**

**No. 1489, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Dec. 28, 2000.

94

Andrew J. McElaney, Jr., (David L. Ferrera and Nutter, McClennen & Fish, LLP, Boston, MA, Kathleen M. McDonald and Kerr McDonald, LLP, Baltimore, on the brief), for appellant.

James E. Gray (Andrew Gendron, Michael B. MacWilliams, Goodell, DeVries, Leech & Gray, LLP, Baltimore, Roger C. Geary, David B. Thorne, Deborah A. Calton and Shook, Hardy & Bacon, LLP, Kansas City, MO, on the brief), for appellant.

Timothy J. Hogan (William C. Burgy, Michael T. Edmonds and Law Offices of Peter T. Nicholl, on the brief), Baltimore, for appellees.

Argued before THIEME, KENNEY, and JAMES S. GETTY, (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

### ON MOTION FOR RECONSIDERATION

A jury in the Circuit Court for Baltimore City awarded appellee, Charles M.P. Connor, $2.225 million dollars for damages resulting from mesothelioma induced from the asbestos in Kent cigarettes; appellee died two months later. Appel-

lants, Hollingsworth & Vose Company ("H & V") and Lorillard Tobacco Company ("Lorillard"), promptly appealed from that judgment, and present the following questions, which we have rephrased, renumbered, and consolidated for clarity:

1. Did the trial court err, as a matter of law, in denying H & V's motion to dismiss for lack of personal jurisdiction, because of the lack of contacts of H & V and its subsidiary with the State of Maryland?

2. Did the trial court err, as a matter of law, by instructing the jury that it could not consider plaintiff's exposure to the asbestos-containing products of non-parties?

3. Did the trial court err, as a matter of law, by instructing the jury that H & V and Lorillard had a post-sale continuing duty to warn about the potential danger of a perishable consumer product?

4. Did the trial court err, as a matter of law, by refusing to include a state of the art instruction on the jury verdict form?

5. Did the trial court err in allowing Dr. Dement to testify concerning the work of Dr. Longo, because such testimony lacked foundation and was both hearsay and deficient, and further err in allowing Dr. Dement to offer opinions outside his area of expertise based on this improperly admitted evidence?

6. Did the trial court err in both its instructions and special verdict form with respect to application of the Cap Statute and, furthermore, err in denying the defendants' post-trial motion with respect to the issue?

7. Did the trial court err in denying defendants' motion for judgment and/or for new trial, when plaintiff had produced insufficient evidence that the original Kent filter caused his disease?

8. Did the trial court err in denying defendants' post-trial motion to dismiss, or, in the alternative, to exhume plaintiff's body?

9. Did the trial court err in denying defendants' post-trial motion seeking appropriate credits under the Uniform Act?

We answer "yes" to question 1, remand as to questions 6 and 9, and answer "no" to questions 2, 3, 4, 5, 7, and 8. We explain.

## Facts

Appellee was diagnosed with mesothelioma in June of 1997 and died as a result of this disease on July 3, 1999. Testimony adduced that appellee's mesothelioma was induced by his exposure to asbestos, although there was divergence as to whether his mesothelioma was caused by the asbestos contained in Kent cigarettes or the occupational asbestos to which he had been subjected. Appellee initially sued 27 "occupational defendants" that manufactured, distributed, or installed asbestos and/or asbestos-containing industrial or commercial products. Appellee alleged that he contracted mesothelioma because he was occupationally exposed to asbestos and asbestos-containing products for 25 years while working as an assembly man and electronics technician at an aircraft manufacturing facility.

Appellee later amended his complaint to include both appellants, contending that his mesothelioma was also substantially induced due to smoking Kent cigarettes from 1952 through 1956, at a time when these cigarettes contained crocidolite asbestos as one of the components in their filters. Lorillard manufactured and distributed the Kent brand cigarettes, and H & V manufactured the crocidolite asbestos filter used in the Kent cigarettes. When trial commenced, only four defendants remained. During jury deliberations, the last two "occupational defendants" settled with plaintiff; thus, H & V and Lorillard were the only remaining defendants. Subsequently, the jury returned a verdict in favor of the plaintiff against H & V and Lorillard in the amount of $2.225 million, with $225,000 representing medical expenses and $2 million repre-

senting non-economic damages. Final judgment was entered; this appeal followed.

## I Personal Jurisdiction over H & V

### *Discussion*

H & V contends that the trial court erred by denying its motion to dismiss for lack of personal jurisdiction. It argues that the State of Maryland lacks personal jurisdiction because it is a non-resident defendant, and jurisdiction cannot be achieved under Maryland's long-arm statute.

H & V is not a Maryland corporation; it was incorporated under the laws of the Commonwealth of Massachusetts, and its principal place of business is in that state. Thus, in order for a Maryland court to assert personal jurisdiction over H & V, it must do so through Md.Code (1973, 1998 Repl.Vol., 2000 Cum Supp.), § 6–103 of the Courts and Judicial Proceedings Article ("CJ"), which provides:

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

■ The purpose of this statute is to give the courts personal jurisdiction over all out-of-state defendants who purposefully avail themselves of the privilege of conducting activities in Maryland, thus invoking the benefits and protections of Maryland law. *Mylan Labs., Inc. v. Akzo,* N.V., 2 F.3d 56 (4th Cir.1993); *Malinow v. Eberly,* 322 F.Supp. 594 (D.Md. 1971); *Mohamed v. Michael,* 279 Md. 653, 370 A.2d 551 (1977) (it is essential in each case that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state—thus invoking the benefit and protection of its laws); *Harris v. Arlen Properties, Inc.,* 256 Md. 185, 260 A.2d 22 (1969).

### *Appellee's Arguments*

Appellee points out that H & V "was directly involved in the promotional undertakings" together with Lorillard in regard to the Kent cigarettes and that "H & V even went so far as to place an upper level employee at Lorillard on a full-time basis." We are given no specific examples of such conduct in appellee's brief. We will not consider this, or subsequent, general conclusory arguments that are supported only by circular reasoning and that are not appropriately correlated with specific legal authority or evidence included in the transcript.

■ The same holds true for appellee's vacant claim that H & V "took affirmative steps to help insure that consumers in Maryland would smoke Kent cigarettes." The record extract in this case consists of five volumes, totaling 3,350 pages. If appellee had evidence of specific instances that would support such allegations, he should have made reference to the record extract. We will not peruse the record extract to find evidentiary support for appellee's conclusory statements.

The liberalizing provision relating to record extracts in Rule 8–501(c) does not excuse the failure to furnish in the brief references to factual material in support of a party's argument as required by Rule 8–504(a)(4). Nor does the liberalization in Rule 8–501(c) alter the fundamental rule of appellate practice under which the appellate court has no duty independently to search through the record for error.

*ACandS, Inc. v. Asner*, 344 Md. 155, 192, 686 A.2d 250 (1996).

Appellee states that "H & V and Lorillard jointly developed the asbestos filter and jointly incorporated it into a product which they placed in the national stream of commerce, including Maryland." Appellee also states that "H & V profited directly from the sales in Maryland and elsewhere—a profit which was 100% contingent upon the marketing effort." Although appellee's arguments may, at first glance, seem seductive, we are not so gullible, devoid of worldly knowledge, or so childlike in our approach to realities that we can be deceived and hoodwinked by claims that have no factual or legalistic basis. First, appellee presents not a spark of evidence to support his claim that H & V had any involvement with Lorillard's placement of the cigarettes in the stream of commerce. Other than a typical manufacturer-retailer relationship, there is no evidence of a joint venture or partnership between the two companies. H & V merely produced the filters that were used as one of the components of the cigarettes; Lorillard placed the cigarettes in the stream of commerce by marketing and distributing them to its consumers.

Appellee's claim that H & V profited directly from the sales and that its profits were completely contingent upon marketing efforts promoting the cigarettes is of dubious relevance. We are at a loss to determine how this has any bearing on whether H & V had minimum contacts with the State of Maryland. Of course its profits were directly related to the sales of the cigarettes. H & V manufactured a component that was used in the cigarettes sold by Lorillard. We take judicial notice of the obvious—that all manufacturers' profits are directly contingent upon the commercial success of the finished product and that H & V profited from its sale of

filters that were used in the cigarettes. Obviously, the more cigarettes Lorillard sold, the more H & V filters Lorillard purchased. How can this be any indication of minimum contacts by H & V? If we were to follow appellee's reasoning, then all manufacturers will be subject to personal jurisdiction for the acts of retailers. Such a result would effectively emasculate the due process clause, and the reach of the long-arm statute would approach infinity.

Appellee argues that "H & V was intimately aware of how its filter was being used in the Kent cigarettes, how they were marketed (including marketing in Maryland through a national advertising campaign), and how they were packaged and sold." These claims are unpersuasive on two grounds. First, once again, there is no reference to any part of the record that substantiates these claims. Second, even if appellee had made specific references to support its claims, the truth of those claims would still not subject H & V to personal jurisdiction. What is the relevance of H & V's knowledge of these matters? To accept appellee's premise, we must then assume that a non-resident advertising agency has minimum contacts with a state if it is "intimately aware" of how its clients market their products in that state. It is incredible to contemplate the consequences of such reasoning on our traditional notions of due process and justice. H & V's role in the sale of the Kent cigarettes was merely in manufacturing the filters. Lorillard's role was to market and distribute the cigarettes. There is nothing in the record that contradicts this conclusion. We choose not to substitute "many-tentacled" for "long-arm" in the statute so that all distributors, manufacturers, and retailers are automatically embraced and subject to personal jurisdiction simply because a company in its supply chain happens to be accessible.

Appellee quotes from *Burger King v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985): "So long as a commercial actor's *efforts are 'purposefully directed' toward residents of another State,* we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there" (emphasis added) (citations omit-

ted), and then goes on to state that, "[h]aving shown that H & V *purposefully established this relationship* with Maryland, additional factors must then be considered...." (Emphasis added.) Appellee has once again used semantics at its convenience. How has H & V purposefully established any relationship with Maryland? It only may be concluded that it purposefully established a business relationship with Lorillard—nothing further. Lorillard's factories were not in Maryland. Lorillard marketed its cigarettes in Maryland, as well as throughout the country, but appellee has not begun to establish that H & V purposefully established a relationship with Maryland. The reference to *Burger King* directly preceding appellee's statement does not make his claim more convincing. H & V's efforts were pellucidly not "purposefully directed" toward residents of Maryland.

Appellee's reliance on the cases it cites is disingenuous; they are easily distinguished from the facts in this case. For example, in *Vermeulen v. Renault U.S.A. Inc.*, 975 F.2d 746 (11th Cir.1992), the defendant had designed its products specifically for the United States market, and thus was subject to personal jurisdiction in the United States. In this case, there is no evidence that H & V designed its filters specifically for the Maryland market, nor is there any evidence that the Maryland market was in any way specifically considered when the filters were designed.

Appellee argues that the State of Maryland has a "strong interest in adjudicating this matter" because it involves injury to a Maryland resident. Moreover, appellee asserts that H & V is not significantly inconvenienced by having the State of Maryland as a forum for this action, because H & V already has been required to defend claims in several other jurisdictions in which it was not a resident corporation. In response, we quote the Maryland Court of Appeals:

> The legitimate interest that Maryland has in providing a forum to one of its citizens, and the fact that the action could probably be litigated in this State without significant inconvenience to the foreign corporations, while factors wor-

thy of serious consideration, cannot alone serve as the foundation for assumption of jurisdiction.

*Camelback Ski Corp. v. Behning,* 307 Md. 270, 513 A.2d 874 (1986), *vacated for further consideration,* 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *aff'd,* 312 Md. 330, 539 A.2d 1107, *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988).

Appellee claims that the "matter would be most efficiently handled by maintenance of the lawsuit against both defendants here." Although such reasoning is certainly a factor in such circumstances, we do not sacrifice due process, fair play, and adherence to judicial precedent on the altar of judicial efficiency. The Due Process Clause "does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations." *World–Wide Volkswagen,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (quoting *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

*World–Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. 559.

We hold that H & V did not establish minimum contacts with the State of Maryland, and that the exercise of personal jurisdiction over H & V would offend traditional notions of fair play and substantial justice; consequently, the trial court erred in asserting personal jurisdiction over H & V.

We turn now to an examination of the trial court's finding that it had jurisdiction over H & V.

*Personal Jurisdiction*

 Application of this long-arm statute is a two-step process. First, it must be determined whether the statute purports to authorize the assertion of personal jurisdiction. Secondly, it must be determined whether an exercise of jurisdiction permitted by the statute violates the due process clause of the Fourteenth Amendment. *Mohamed v. Michael,* 279 Md. 653, 370 A.2d 551 (1977); *Geelhoed v. Jensen,* 277 Md. 220, 352 A.2d 818 (1976).

 Under the familiar due process analysis enunciated in profuse Maryland and U.S. Supreme Court decisions, a defendant must have sufficient minimum contacts with the forum state so that the maintenance of a suit does not offend traditional notions of fair play and substantial justice. *Malinow v. Eberly,* 322 F.Supp. 594; *Mohamed,* 279 Md. 653, 370 A.2d 551; *Geelhoed,* 277 Md. 220, 352 A.2d 818; *Groom v. Margulies,* 257 Md. 691, 265 A.2d 249 (1970) *Harris v. Arlen Properties,* 256 Md. 185, 260 A.2d 22; *Allen v. Allen,* 105 Md.App. 359, 659 A.2d 411 (1995). The Due Process Clause of the Fourteenth Amendment limits the power of a state court to exert personal jurisdiction over a nonresident defendant. "[The] constitutional touchstone" of the determination whether an exercise of personal jurisdiction comports with due process "remains whether the defendant purposefully established 'minimum contacts' in the forum *State."* *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

This concept of minimum contacts, however, has been the source of considerable controversy. In 1945, the Supreme Court first articulated that the "presence in a state" necessary in order to establish personal jurisdiction over the person was too limited for the increasing demands of interstate commerce and an expanding economy. Subsequently, the Supreme Court adopted a more tractable approach that recognized a state's jurisdictional power over a person not only when an individual is physically present within the state, but also when the individual conducts meaningful activity within the state

even though not physically present, as long as notions of fairness are present in asserting jurisdiction over that individual. See *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154.

In the passage of time since *International Shoe*, the Supreme Court has further polished the definition of "minimum contacts." In *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court limited the "minimum contacts" necessary to confer jurisdiction to those activities of an out-of-state defendant by which the defendant "purposely avails itself of the privilege of conducting activities within the forum state." *Id.* at 253, 78 S.Ct. 1228. This occurs when the contacts "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state," *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174, or when the defendant's efforts are "purposefully directed" at the state. *Id.* at 476, 105 S.Ct. 2174. This determination must depend "upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *International Shoe*, 326 U.S. at 319, 66 S.Ct. 154.

The sequel to *International Shoe* was the landmark 1980 Supreme Court case, *World–Wide Volkswagen*, 444 U.S. 286, 100 S.Ct. 559. In that case, a married couple purchased a new Audi automobile from a dealer in New York, and were involved in an accident in Oklahoma while on their way to their home in Arizona. The accident resulted in severe injuries to the wife and two children. The couple brought suit in Oklahoma against the New York dealer and the New York distributor, claiming that design defects in the automobile contributed to the injuries. While the plaintiffs acknowledged that the two New York corporations were present, and did business, only in New York, they argued that Oklahoma's exercise of jurisdiction over the New York corporations was appropriate because of the mobile nature of the automobile and the foreseeability that some cars these corporations sold would find their way into Oklahoma.

The Supreme Court, however, rejected this argument, ruling that the exercise of personal jurisdiction over the New York corporations by an Oklahoma court would violate the Fourteenth Amendment because the New York corporations directed no activity to Oklahoma. The Supreme Court maintained the same reasoning it had held in previous cases, including *International Shoe,* which was the lodestar on this subject. The Court stated that the defendants had not availed themselves of any privileges and benefits of Oklahoma law, that the defendants had not solicited any business there either through salespersons or through advertising reasonably calculated to reach the state, that the record did not show that the defendants regularly sold cars at wholesale or retail to Oklahoma customers or residents, and that the defendants had not indirectly, through others, served or sought out to serve the Oklahoma market. *Id.* at 295, 100 S.Ct. 559.

The holding in *World–Wide Volkswagen* was consistent with the earlier cases; however, the Court addressed the plaintiffs' assertion that, because an automobile is mobile by its very design and purpose, it was "foreseeable" that the plaintiffs' Audi would cause injury in Oklahoma. The Court responded that "foreseeability" alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause. *Id.* It added, however:

> This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

*Id.* at 297, 100 S.Ct. 559. *See Kulko v. California Superior Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

The Due Process Clause, by ensuring the "orderly administration of the laws," gives a degree of predictability to the legal system that allows potential defendants to structure

their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. *International Shoe,* 326 U.S. at 319, 66 S.Ct. 154.

This brings us to the "stream of commerce" rationale raised in *World–Wide Volkswagen,* relied on by appellee. The *World–Wide Volkswagen* Court stated that "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559. The Court concluded that, although it was foreseeable that purchasers of automobiles sold by defendant may take them to Oklahoma, the mere "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* at 298, 100 S.Ct. 559. Thus, although the Supreme Court in *World–Wide Volkswagen* held that personal jurisdiction was not present, it gave credence to the "stream of commerce" assertion on which appellee bases its contention for personal jurisdiction. We shall now discuss this "stream of commerce" approach and explain why we reject it under the facts of this case.

In its review of the *World–Wide Volkswagen* opinion, the Fourth Circuit U.S. Court of Appeals in *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir.1994), stated that, "[n]otwithstanding the breadth of this 'stream of commerce' language, the entire opinion indicates that the Court has not abandoned the notion that jurisdiction must rest on a person's activity deliberately directed toward the forum state." *Lesnick,* 35 F.3d at 943–44. The Fourth Circuit went on to assert:

> In sum, the *World–Wide Volkswagen* Court's repeated reliance upon the fact that defendants, who did not direct any of their activities toward Oklahoma, could not have anticipated being subject to the jurisdiction of Oklahoma courts, leads us to believe that we should not read the "stream of commerce" language out of context. While *World–Wide*

*Volkswagen* has been cited for the proposition that personal jurisdiction may follow a product if it is delivered "into the stream of commerce with the expectation that [it] will be purchased by consumers in the forum state," [citations omitted] we read the holding of the case to be much narrower, requiring purposeful activity on the part of the defendants to establish a meaningful contact with the forum state.

*Id.* at 944.

The next Supreme Court case refining the "minimum contacts" standard and its application to personal jurisdiction was the paradoxical case of *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi,* a Californian was injured in a motorcycle accident when its rear tire tube exploded. He filed suit against the Taiwanese manufacturer of the tube, which, in turn, impleaded Asahi, a Japanese company that manufactured and supplied the tube's valve assembly. Asahi conceded that it was aware that its valve assemblies would eventually be sold on motorcycles throughout the United States, but it contended that it never expected to be sued in the United States, since all of its sales flowed from Japan to Taiwan.

In *Asahi,* the Supreme Court produced two dissonant plurality opinions, with each opinion shared by four Justices. The schism was over whether the first prong under the *International Shoe* analysis, specifically, the minimum contacts standard, had been achieved. Although there was no majority opinion as to whether minimum contacts existed, the Court did unanimously hold that personal jurisdiction was not present. Taking into account the burden on Asahi to defend an American suit, the Court relied on the second prong of *International Shoe* and decided that California's assertion of jurisdiction over *Asahi* would be unconstitutional, because it would "offend traditional notions of fair play and substantial justice." *Asahi,* 480 U.S. at 113, 107 S.Ct. 1026. In discussing the first prong of the *International Shoe* analysis—whether minimum contacts were present—four Justices, including Justice O'Connor, Chief Justice Rehnquist, and Justices Pow-

ell and Scalia, opined that the minimum contacts standard had not been met. Justice O'Connor, writing for that plurality, articulated:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi,* 480 U.S. at 112, 107 S.Ct. 1026. In sum, according to the plurality opinion written by Justice O'Connor, even though Asahi may have been aware that its products would eventually be sold in California, its lack of conduct directed specifically at California made jurisdiction in California improper under a "minimum contacts" analysis.

In contrast, Justice Brennan, joined by Justices White, Marshall, and Blackmun, concluded that *World–Wide Volkswagen* should not be read to require "additional conduct" beyond simply placing a product in the stream of commerce with the expectation that it will be purchased in the forum state. As Justice Brennan continued, "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi,* 480 U.S. at 117, 107 S.Ct. 1026.

Justice Stevens remained above the discord by declining to address the issue and stating that it did not need to be resolved because of the unanimous decision to rely on the second prong of *International Shoe.* He did state, however,

that, "even assuming that the [minimum contacts] test ought to be formulated here," Justice O'Connor's opinion "misapplies [the test] to the facts of [*Asahi*]." *Id.* at 122, 107 S.Ct. 1026. Justice Stevens concluded that Asahi's conduct did rise to the level of "purposeful availment" in the state of California because of the large number of Asahi's units that ended up there. *Id.*

Conceding that there has been dissension among courts in the interpretation of the minimum contacts standard, the O'Connor plurality opinion in *Asahi* articulated:

> In World–Wide Volkswagen itself, the state court sought to base jurisdiction not on any act of the defendant, but on the foreseeable unilateral actions of the consumer. Since World–Wide Volkswagen, lower courts have been confronted with cases in which the defendant acted by placing a product in the stream of commerce, and the stream eventually swept defendant's product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum State. Some courts have understood the Due Process Clause, as interpreted in World–Wide Volkswagen, to allow an exercise of personal jurisdiction to be based on no more than the defendant's act of placing the product in the stream of commerce. Other courts have understood the Due Process Clause and the above-quoted language in World–Wide Volkswagen to require the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce.

*Id.* at 110, 107 S.Ct. 1026.

Concluding the discussion on the two divergent interpretations of the minimum contacts standard, the O'Connor plurality opinion stated that the more stringent "purposefully directed" test, rather than the "stream of commerce test," was the position that was "consonant with the requirements of due process." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. "The substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come

about by *an action of the defendant purposefully directed toward the forum State." Id. See Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

Aware that the federal circuits are confrontational on this recondite question of whether the "stream of commerce" language in *World–Wide Volkswagen* should control in this type of analysis, our reading of *World–Wide Volkswagen* and *Asahi* is in harmony with the ray that broke through the clouds of logical inconsistency in the Fourth Circuit with *Lesnick.* The *Lesnick* Court reviewed in considerable detail the *Asahi* Supreme Court opinion, concluding:

> [T]he Supreme Court has not abandoned the *International Shoe* two pronged test as further articulated in *Hanson* and *Burger King.* The touchstone of the minimum contacts analysis remains that an out-of state person have engaged in some activity purposefully directed toward the forum state. *See Hanson,* 357 U.S. at 253[, 78 S.Ct. 1228]; *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 297[, 100 S.Ct. 559]. And if that initial test is met, a court must still determine whether the exercise of such jurisdiction would offend traditional notions of fair play and substantial justice. *See Asahi,* 480 U.S. at 113[, 107 S.Ct. 1026]. This reading of *World–Wide Volkswagen* and *Asahi* has prior support in our jurisprudence. *See Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 477 (4th Cir.1993) (holding that minimum contacts exist where the defendant "purposefully directs its activities toward the residents of the forum"); *see also Federal Insurance Co. v. Lake Shore, Inc.,* 886 F.2d 654 (4th Cir. 1989). To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism. Such a rule would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure

their business contacts and risks. Moreover, we do not believe that the holding of *World–Wide Volkswagen* takes us as far as plaintiff in this case suggests. Thus, we hold that the test to be applied in considering the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies. *See Hanson,* 357 U.S. at 253[, 78 S.Ct. 1228]; *Burger King,* 471 U.S. at 475[, 105 S.Ct. 2174]; *Asahi,* 480 U.S. at 113[, 107 S.Ct. 1026].

*Lesnick,* 35 F.3d at 945–46.

As in *Asahi,* H & V in the case at bar has done nothing that would subject it to personal jurisdiction under the minimum contacts standard. H & V manufactured its filters in Massachusetts, it did not maintain an office in Maryland, it did not ship its filters to Maryland, it does not appear from the record that it designed or manufactured its filters specifically for the Maryland market, nor did it advertise or market its filters in Maryland. The evidence shows that H & V distributed its filter material to Lorillard's plants in Kentucky and New Jersey and that H & V had no involvement with the manufacture of Kent cigarettes, nor any control over their sale and distribution.

Although it is reasonable to assume that H & V was aware that its filters, as components of Kent cigarettes, would be purchased and smoked within the State of Maryland, this will not suffice to establish minimum contacts. We hold that H & V did not possess sufficient minimum contacts with the

State of Maryland in order to subject it to personal jurisdiction within this State under the facts in this case.

## II Jury Instructions

### Standard of Review

*Farley v. Allstate Ins. Co.* 355 Md. 34, 46–47, 733 A.2d 1014 (1999), stated:

We have held that the standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them. Accordingly, Md. Rule 2–520, "Instructions to the jury," states in pertinent part: "(c) How given. The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions on its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." Thus, simply because a requested instruction is an accurate statement of the law and supported by the evidence does not mean the trial judge is required to give it to the jury. So long as the trial judge has covered the applicable law in another instruction, or combination of instructions, Md. Rule 2–520(c) makes clear that he or she does not have to give it to the jurors.

In reviewing the propriety of a trial court's denial of a requested jury instruction, we must examine "whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Moreover, the standard for reversible error places the burden on the complaining party to show both prejudice and error.*

(Emphasis supplied, citations omitted.)

We now turn to an examination of the jury instructions at issue in this appeal.

*Appellee's exposure to asbestos by non-parties*

■ Appellants assert that the trial court erred by instructing the jury that "a plaintiff's possible exposure to asbestos-containing products of non-parties is not to be considered by you in your determination of substantial causation."

The Court instructed as follows:

If a defendant's products were a substantial factor in bringing about the injuries to the plaintiff, the fact that the defendant could not anticipate the exact type of injury for which the plaintiff seeks recovery or the exact manner in which the injury came about does not relieve the defendant from responsibility.

Whether the exposure of any given user or consumer to a particular manufacturer's, supplier's or installer's product would be legally sufficient to permit a finding of substantial causation is a fact specific to each case.

The analysis of substantial causation, which is Question Two, focuses upon the plaintiff's failure—exposure to all products.

The fact that the plaintiff may have been exposed to a variety of asbestos products does not relieve the defendant of liability for the injuries complained of.

*A plaintiff's possible exposure to asbestos-containing products of non-parties is not to be considered by you in your determination of substantial causation.*

That finding would involve the interrelationship between the use of a defendant's products and the activities of the person using it either at the work place or in the general public domain.

(Emphasis supplied.)

Appellants argue that they have shown asbestos exposure by non-parties by demonstrating that the cigarettes were not unreasonably dangerous and that they were not a substantial causal factor of plaintiff's mesothelioma. They claim to have demonstrated this through evidence of appellee's occupational exposure to asbestos during his 25–year employment at Glen

L. Martin. They further claim to have demonstrated this through the testimony of Dr. Allen Gibbs, an expert in the field of pathology and asbestos-related disease, who testified that the release of asbestos from the Kent filter was insignificant; by Dr. Rubin's testimony that "workers at Glen L. Martin have mesothelioma far greater than anybody else in the universe"; and by the testimony of three other experts that indicated that 80% of mesothelioma diagnoses in North American men are attributable to occupational exposure to asbestos.

The Court, continuing to instruct on the defendants' duty, proceeded as follows:

There may be more than one cause of an injury; that is, several negligent acts may work together.

Each party whose negligent act is the cause of an injury is responsible.

It is necessary and sufficient to constitute probable cause that the conduct of a particular defendant charged or the product or products of a particular defendant were an efficient cause that helped to set in motion the chain of circumstances leading up to the injury and that helped to produce the injury.

Failure to warn must be a proximate cause of the incident. Each defendant's product or products may be considered a legal cause of the plaintiff's harm if the defendant's product or products are a substantial factor in bringing about the harm.

The word substantial used in this sense means that the defendant's product or products must have had such an effect in producing a harm as to lead reasonable persons to regard it as a cause.

Where a plaintiff has proved a disease resulting from exposure to asbestos products of different identified manufacturers or suppliers, no manufacturer or supplier has a defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling or ingesting fibers originating from the products of others.

Where the separate and independent acts of several defendants combined to produce a single injury, each defendant is responsible for the entire injury.

In other words, joint defendants may be legally responsible, even if their participation in that injury occurred at different times, in different ways and in unequal proportions.

You shall not apportion or distribute responsibility in these cases.

We find no basis for disturbing the trial judge's ruling regarding this jury instruction. The trial court's jury instruction followed the legal explanation articulated in *ACandS, Inc. v. Asner*, 344 Md. 155, 686 A.2d 250 (1996), a case cited by both appellants and appellee.

In *Asner*, the Court of Appeals provided a guideline for dealing with jury instructions as to exposure by non-parties.

A factual defense may be based on the negligible effect of a claimant's exposure to the defendant's product, or on the negligible effect of the asbestos content of a defendant's product, or both. In such a case the degree of exposure to a non-party's product and the extent of the asbestos content of the non-party's product may be relevant to demonstrating the non-substantial nature of the exposure to, or of the asbestos content of, the defendant's product. But, a defendant would not ordinarily generate a jury issue on lack of substantial factor causation only by showing the dangerousness of a non-party's product to which the claimant was exposed. Ordinarily a defendant would have to follow up the evidence of exposure to the products of non-parties with evidence tending to prove that the defendant's product was not unreasonably dangerous or was not a substantial causal factor. Under these circumstances the proposition that the defendant's product is not a substantial cause may be made more probable by evidence tending to prove that the claimant's disease was caused by the products of one or more non-parties. *See, e.g., Becker v. Baron Bros.*, 138 N.J. 145, 649 A.2d 613 (1994) (whether processed chrysotile in brake

products posed a risk of causing mesothelioma in users was a sharply disputed issue of fact at trial, so that trial court erred in instructing as a matter of law that the products were defective without a warning).

*Id.* at 176–77, 686 A.2d 250 (footnote omitted).

We point out that, at the time this jury instruction was given, Owens–Corning was still a defendant in this action. It was not until after jury instructions had been given and the jury began its deliberations that Owens–Corning settled with appellee. Therefore, at the time of the instruction, Owens–Corning was still a party, and, consequently, the instruction did not preclude the jury from considering the effects of any asbestos exposure caused by Owens–Corning.[1]

To counter the possible effect on the jury of the technical application of this instruction, appellants could have re-visited this issue once Owens–Corning was no longer a party in this action. After the settlement, appellants may have been better served by requesting further instructions at that time. However, appellants' insouciance prevents us from addressing the issue.

Therefore, we find that the trial judge properly instructed the jury that it should disregard any evidence relating to plaintiff's exposure to the asbestos-containing products of non-parties. Appellants have not demonstrated that any prejudice and error resulted from the trial judge's jury instructions. The instructions given to the jury adequately covered the applicable law.

---

1. To reiterate, the jury instruction prohibited consideration of evidence relating to appellee's exposure to the asbestos-containing products of *non-parties.* While the jury was deliberating, appellants' counsel discovered that Owens–Corning had settled with appellee. Immediately thereafter, the jury was called back to the courtroom. The judge instructed the jurors to cross off every reference to Owens–Corning on their verdict sheet, because "[t]hey are no longer a party in this proceeding, so you do not consider them." After this instruction, the jurors were told to go back and continue their deliberations. At no time after this did either appellant request additional jury instructions.

### Continuing Duty to Warn

■ Appellants' next contention is that the trial court should not have provided the standard jury instruction pertaining to a defendant's continuing duty to warn about a perishable consumer product. Appellants contend that the instruction does not apply in a situation where the product was used and discarded by the consumer. The jury instruction in question, in relevant part, provided: "Generally, a manufacturer or supplier of a defective product has the duty to warn of the product defects which they discover after the time of sale and must make reasonable efforts to issue a post-sale warning."

Appellants concede that, as a general rule, "a manufacturer of a defective product has a duty to warn of product defects which the manufacturer discovers after the time of sale." *See Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 446, 601 A.2d 633 (1992). However, appellants contend that in the present case this jury instruction was incorrect because "no post-sale warning could have prevented the harm alleged to have been suffered by plaintiff. Unlike, for example, asbestos-containing pipe insulation, which stays in place for many years after installation, Kent cigarettes were used and discarded shortly after they had been purchased." Appellants further contend that "[a] 'product recall' of asbestos-containing Kent cigarettes many years after Lorillard stopped manufacturing them would have been a futile gesture." In support of their position, they cite *Ierardi et al. v. Lorillard, Inc.*, 777 F.Supp. 420 (E.D.Pa. 1991).

Mass production and wide distribution may limit the response duty rather than defeat the duty's existence. When a manufacturer of a mass-produced, widely distributed product becomes aware that there is a peril associated with the product, creating a risk of serious injury or death, the manufacturer may have a duty to take reasonable steps to notify users of that danger. It would be unreasonable to require such a manufacturer to track down every purchaser and user, but it may be appropriate, in certain cases, to require a

manufacturer to take reasonable steps under the circumstances to widely disseminate notice of the danger. What constitutes reasonable notice would be a question of fact for the jury.

Appellants presented this contention to the trial judge; the judge nonetheless chose to instruct the jury pertaining to a continuing duty to warn. We will not disturb the trial judge's findings as to whether such efforts to warn, either by use of a product recall or other type of remedial measure, would have been futile. We observe that this "continuing duty to warn" instruction was not error, and, moreover, that it was certainly not prejudicial to appellants' case; the jury, irrespective of this instruction, found that appellants were liable to plaintiff, as their products were substantial causes of his mesothelioma. We find, therefore, that the trial judge properly instructed the jury that a manufacturer or supplier has a continuing duty to warn about a product defect discovered after the sale of the product.

## State of the Art Instruction

The trial court erred, appellants contend, by failing to provide a specific instruction on the jury verdict form, or as a curative instruction, that consideration of the state of the art is appropriate. Appellants assert that a determination as to whether there was insufficient knowledge of the manufacturer or of the scientific field in general would have been relevant in order to determine whether the Kent cigarettes, and more specifically the asbestos filters therein, were defective for legal purposes. Appellants contend that the jury should have been instructed as to the state of scientific and medical knowledge, as it existed at the time when plaintiff smoked the Kent cigarettes, regarding the hazards of asbestos exposure.

The Court instructed as follows:

Under both the negligence and strict liability theories of liability, the manufacturer is held to the knowledge and skill of an expert.

A manufacturer's status as an expert means that, at a minimum, the manufacturer must keep abreast of the scientific knowledge, discoveries and advances and is presumed to know what is imparted thereby.

Industry standards and state of the art are not synonymous. State of the art includes all of the available knowledge on a subject at a given time. And this includes scientific, medical, engineering and other knowledge that may be available.

State of the art includes the element of time; what was known and when was this knowledge available.

. . . .

You are instructed that evidence offered by any of the defendants to show that its conduct was reasonable in the light of prevailing industry standards and the scientific and medical knowledge at relevant points in time may be considered by you in determining whether a defendant was negligent or the product was defective.

Appellee correctly points out that a state of the art instruction *was* given as part of the jury instructions and in accord with *ACandS, Inc. v. Asner*, 344 Md. at 165–66, 686 A.2d 250 (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986)).

"Industry standards are the practices common to a given industry. They are often set forth in some type of code, such as a building code or electrical code, or they may be adopted by the trade organization of a given industry. State of the art is a higher standard because scientific knowledge expands much more rapidly than industry can assimilate the knowledge and adopt it as a standard."

. . .

The role of state of the art evidence under Maryland law in strict liability, failure to warn cases was explained in *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 432–38, 601 A.2d 633, 638–641, *reh'g denied*, 325 Md. 665, 602 A.2d 1182

(1992). Acknowledging some division of opinion in the authorities, [the Maryland Court of Appeals] recognized in *Zenobia* that a majority of courts hold, expressly or implicitly, "that a manufacturer of a product, which is defective only because of the lack of an adequate warning, is not liable when the failure to warn resulted from an absence of knowledge of the dangerous quality of that product." *Id.* at 433, 601 A.2d at 639. But, "the required knowledge can be established by evidence that the dangerous quality of the product should have been known by a manufacturer because it was known in the scientific or expert community." *Id.* "[E]vidence concerning the presence or *absence* of knowledge in the expert community is called 'state of the art' evidence." *Id.* at 435, 601 A.2d at 640 (emphasis added).

Testimony adduced at trial by appellee, although contested by appellants' testimony, demonstrated that it was known within the scientific community at the time the Kent cigarettes were being manufactured with the asbestos filters that exposure to asbestos could cause disease.[2] The jury was free to

---

**2.** There was testimony presented both agreeing and disagreeing that this relationship was known within the scientific community at that time. Among others, Dr. Dement testified that this relationship was known at the time:

Q: Doctor, let me ask you this question. When was it established that asbestos could cause disease and harm in human beings? When was that established in the United States?

A: Well, certainly the fact of causing harm in the case reports were before 1924, but the date when I would say minimally that there was a causal relationship, not just an observation of disease and population, interesting finding, but one that the exposures cause the disease was by 1924. You can argue about dates, but by 1938, we had large-scale studies in the U.S. that were documenting asbestosis, again, in the asbestos textile industries by chest x-rays and measures of exposure.

. . .

So most researchers will say between '49 to '55 period is when you could say, with confidence, that there was a causal relationship, if you will, between lung cancer and exposure to asbestos. That is, it is not just objectionable cases, but there is a causal relationship.

Q: Doctor, was there an editorial that appeared in the Journal of the American Medical Association in the late 1940s that spoke on this issue?

assess the credibility of the testimony, and decide for itself which evidence to believe. *See Ebb v. State,* 341 Md. 578, 596, 671 A.2d 974 (1996).

We find that the trial judge did in fact instruct the jury regarding a state of the art defense, and such instruction adequately covered the applicable law.

### Statutory Cap on Non–Economic Damages

Appellants assert that the trial court erred in its instruction to the jury regarding a statutory cap on non-economic damages. Appellants correctly argue that the jury instruction on this issue directly affected the amount of damages awarded. We agree with appellants' contention that this jury instruction was incorrect. The instruction in question, Jury Interrogatory 2, asked of the jury: Do you find by a preponderance of the evidence that the first cellular changes which lead [sic] to the existence of Charles M.P. Connor's mesothelioma began before July 1, 1986?" Appellants had proposed that the trial court instead phrase the question in this manner:

> When did the cellular change caused by asbestos result in Charles Connor's mesothelioma? a) on or after July 1, 1986, b) before July 1, 1986, or c) we can not determine whether Mr. Connor's disease began before or after July 1, 1986.

The wording of the instruction is critical because of Maryland's Cap Statute, which provides that noneconomic damages "may not exceed $350,000" in any personal injury action "in which the cause of action arises on or after July 1, 1986 . . . ." C.J. § 11–108(b).

The parties disagree as to what stage of appellee's illness is the critical point for determining whether noneconomic damages are subject to the cap statute. Appellants' position is

---

A: It did. There was an editorial that reviewed, again, these studies that I referred to. And the editorial concluded that there were— there appeared to be a causal relationship between exposure to asbestos and cancer of the lung. That, again, was published in the U.S. in the Journal of the American Medical Association.

that appellee's cause of action arose after July 1, 1986, thereby imposing the applicability of the statute and effectively reducing the amount of noneconomic damages. Thus, appellants assert that appellee's cause of action arose only when he actually contracted mesothelioma.

Appellee, on the other hand, naturally wishes to convince this Court that his cause of action arose before that time, specifically, when the first cellular change took place within his body. Appellee urges that this cellular change gave rise to his cause of action, as this is when his body first changed as a result of his exposure to asbestos. Such interpretation would result in the injury predating the cap statute. Appellee's position, that his cause of action arose before July 1, 1986, would preclude the statute's applicability in this case. The jury instruction given by the trial court asked when there was evidence of the first cellular changes that led to the mesothelioma; this wording represented the interpretation posed by appellee, focusing on the onset of cellular change, rather than appellants' position, which focused on the onset of the actual mesothelioma.

 If appellee's interpretation is correct under the intent of the statute, then the jury instruction was indeed correct. The instruction is incorrect, however, if the intended point of time under the statute is actually the contraction of the disease. Consequently, the issue can be simply stated—what stage within the temporal spectrum of appellee's disease is the determinative point under the cap statute? Identifying the time at which an asbestos-related injury came into existence is easier said than done. Due to the incipient nature of asbestos-related disease, experts and courts alike have had difficulty in pinpointing its onset. *Id.*[3]

---

**3.** In his Motion To Strike Arguments First Raised in Appellant's Reply Brief, appellee asks this Court to strike certain portions of the Reply Brief of appellant Lorillard that present a new contention not raised in initial briefs. In its reply brief, Lorillard asserted that expert testimony by Dr. Gabrielson was speculative and not probative on the issue of the inception of appellee's disease, and that the testimony was "insufficient

■ In construing the cap statute, "we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary." *Owens–Illinois v. Armstrong*, 326 Md. 107, 121, 604 A.2d 47 (1992); *Brodsky v. Brodsky*, 319 Md. 92, 98, 570 A.2d 1235 (1990); *see also Edmonds v. Cytology Services of Maryland, Inc., et al.*, 111 Md.App. 233, 681 A.2d 546 (1996). According to *Webster's New World*

---

as a matter of law to carry plaintiff's burden on the Cap Statute's application."

We will not rule on the merit of Lorillard's contention because, as appellee correctly states, the issue of the sufficiency of expert testimony regarding the cap statute was not raised in either of appellants' initial briefs. In *Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md.App. 446, 459, 406 A.2d 928, 937 (1979), we stated:

The function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal. We think that the reply brief must be limited to responding to the points and issues raised in the appellee's brief. This is the uniform view of other courts which have considered the issue. *See, e. g., Molnar v. City of Aurora*, 38 Ill.App.3d 580, 348 N.E.2d 262, 264 (1976) ("The reply brief, if any, shall be strictly confined to replying to arguments presented in the brief of appellee. . . ."). *See also St. Regis Paper Co. v. Hill*, 198 So.2d 365 (Fla.Dist.Ct.App.1967); *Wolfswinkel v. Gesink*, 180 N.W.2d 452 (Iowa 1970); *Horicon v. Langlois' Estate*, 115 Vt. 470, 66 A.2d 16 (1949); *Mead School Dist. No. 354 v. Mead Educ. Ass'n*, 85 Wash.2d 278, 534 P.2d 561 (En banc 1975). To allow new issues or claims to be injected into the appeal by a reply brief would work a fundamental injustice upon the appellee, who would then have no opportunity to respond in writing to the new questions raised by the appellant. Due process requires that all parties have an opportunity to reply to new issues asserted against them, as the California Supreme Court has recognized in a similar context: "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." *Varjabedian v. City of Madera*, 20 Cal.3d 285, 295 n. 11, 142 Cal.Rptr. 429, 436 n. 11, 572 P.2d 43, 50 n. 11 (1977). *See also Ryall v. Waterworks Improvement Dist. No. 3*, 247 Ark. 739, 447 S.W.2d 341 (1969).

"The reply brief must do what it purports to do: it must respond to the points raised in the appellee's brief which, in turn, are addressed to the issues originally raised by the appellant." *Esham*, 43 Md.App. at 459, 406 A.2d 928. We shall therefore grant appellee's motion to strike certain portions of Lorillard's Reply Brief. The specific portion mentioned, namely, the sufficiency of Dr. Gabrielson's expert testimony, will not be considered, and Lorillard shall be confined in its appeal to the issues raised in appellants' initial briefs.

*Dictionary* (2d ed.) the word "arise" means "to come into being; originate." Giving the word its ordinary meaning, we believe that a cause of action arises when it first comes into existence. *Armstrong,* 326 Md. at 121, 604 A.2d 47.

A cause of action in negligence or strict liability arises when facts exist to support each element. *Id.* In a negligence cause of action, the fact of injury would seemingly be the last element to come into existence. The breach, duty, and causation elements logically precede the fact of injury. Likewise, in a strict liability claim, the existence of the defective product and the causal connection will precede the resultant injury. *Id.* Therefore, appellee's non-economic damages would have to be reduced under § 11–108 of the Courts & Judicial Proceedings Article if his "injury" came into existence on or after July 1, 1986. We have pointed out that, according to § 388 and § 402A of the Restatement (Second) of Torts, "harm" is one of the necessary elements of a cause of action in both negligence and strict liability. The Restatement, in § 7(2), defines "the word 'harm' as used throughout the Restatement ... to denote the existence of loss or detriment in fact of any kind to a person resulting from a cause." *Owens Corning v. Bauman,* 125 Md.App. 454, 477, 726 A.2d 745 (1999). Comment b to § 7 further explains that " 'harm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing...." *Id.* (quoting *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 692 A.2d 5 (1997), *vacated in part on other grounds sub nom. Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998)).

Appellants cite this Court's decision in *Bauman* to support their contention that the jury's award of noneconomic damages must be reduced. In that case, we remanded to the circuit court for the submission of the issue of when appellee's mesothelioma "arose" for purposes of determining the applicability of the statutory cap, pursuant to C.J. § 11–108. Judge Davis, speaking for this Court, stated:

The unique facts of this case compel us to conclude that the ends of justice can only be served by granting appellant the

opportunity to submit the issue of the statutory cap to a jury, particularly in view of the court's advisement that it would consider the cap issue on appellant's post-trial motion. On remand, the circuit court should submit to a newly empaneled jury only the limited issue of when mesothelioma arose in appellee. Should the jury determine that the disease arose before July 1, 1986, the statutory cap would not be applicable and the noneconomic damage award of the original jury would stand. A jury decision that appellee's mesothelioma arose on or after July 1, 1986, on the other hand, would require the circuit court to apply the $350,000 cap on the noneconomic damage award.

125 Md.App. at 522, 726 A.2d 745.

As part of our discussion in *Bauman,* and before we had declared our holding, we had clarified this point by stating:

In sum, mere exposure, without cellular change, does not constitute an injury or harm for which one may maintain a cause of action. Furthermore, cellular change without accompanying injury does not constitute harm or functional impairment that would give rise to a cause of action. For purposes of the statutory cap, the crucial distinction is whether a plaintiff's cellular change develops into an asbestos-related disease or simply into an asbestos-related condition. When cellular change later results in an asbestos-related disease, the harm was irreversible from the time of contraction, and the "injury" as well as the cause of action arose when the disease came into existence. Consequently, the presence or absence of symptomatology is irrelevant for purposes of the statutory cap, because the cause of action arose when the disease was contracted. On the other hand, when a plaintiff becomes afflicted with an asbestos-related condition, such as pleural plaques, it is not until symptomatology is present that any functional impairment occurs. Therefore, when a plaintiff develops an asbestos-related condition, the statutory cap only is triggered upon the presence of symptoms, because there is no harm until the symptoms arise. In the case *sub judice,* however, appellee

developed an asbestos-related disease and the irreversible harm arose when the disease came into existence.

*Id.* at 482–83, 726 A.2d 745.

Appellee incorrectly asserts that the *Bauman* Court concluded the following:

> When a plaintiff actually contracts an asbestos-related disease, the legally compensable harm may be retraced to the first moment of cellular change; however, when a plaintiff contracts the condition of pleural plaques, the legally compensable harm only arises with the onset of a symptom. Therefore, the standard for determining harm is uniform, but an "injury" does not arise until symptoms are manifested while the harm for a fatal and irreversible "disease" arises as soon as the cellular change develops. Our recent decisions in *Ford [Motor Co. v. Wood,* 119 Md.App. 1, 703 A.2d 1315] and [*ACandS, Inc. v.] Abate[,* 121 Md.App. 590, 710 A.2d 944] have followed the *Grimshaw* standard and, accordingly, Maryland law is clear as to when an asbestos-related injury becomes a legally compensable harm.

125 Md.App. at 482, 726 A.2d 745. Appellee errs in his interpretation of *Bauman,* as we have already set forth our conclusion in the *Bauman* case. Our conclusion in *Bauman* clearly stands for the interpretation posed by appellants. Moreover, in that they contradict our holding in that case, we reject and disregard the two paragraphs quoted from *Bauman* by appellee. This language represents inaccurate statements of the law on this point, and leads to further obfuscation on this topic. We reject appellee's other quote taken from Bauman, specifically:

> A person diagnosed with mesothelioma has suffered a real and immediate injury which was inflicted when the cancer cells first began growing in his body-even though the person was not aware of that injury until the cancer was diagnosed. By contrast, a person who is merely diagnosed with pleural plaques has no present loss, detriment, impairment or injury.

This quoted language was actually taken from a footnote in the *Grimshaw* case. The statement it footnoted was: "Although pleural plaques are merely changes in the body that only become 'injury' if symptoms develop, *mesothelioma and asbestosis are diseases that constitute compensable harm upon contraction.*" 125 Md.App. at 479, 726 A.2d 745. (Emphasis added.) We regret that the footnote quoted by appellee, intended to clarify the discussion, actually caused additional confusion, as is evident by appellee's reliance on it. We will not, however, raise a mere footnote to a loftier stature than the actual statement that it attempts to clarify. We observe that the original statement, "[a]lthough pleural plaques are merely changes in the body that only become 'injury' if symptoms develop, mesothelioma and asbestosis are diseases that constitute compensable harm upon contraction," is an accurate statement of our position, and that this statement completely explains the distinction we are dealing with in this case. To the extent that it unsettles the issue before us and clearly is a misrepresentation of the law on this subject, we unequivocally reject that particular language used in footnote 7 in *Grimshaw.*

Appellee has quoted language from *Grimshaw,* and that case remains sound law, but for the language we have now rejected. In fact, the standard enunciated in *Grimshaw,* which is controlling in Maryland, is that "harm results when the cellular changes *develop into an injury or disease.*" (Emphasis added.) *Grimshaw,* 115 Md.App. at 160, 692 A.2d 5; *see ACandS, Inc. v. Abate,* 121 Md.App. 590, 710 A.2d 944, *cert. denied,* 350 Md. 487, 713 A.2d 979 (1998); *Ford Motor Co. v. Wood,* 119 Md.App. 1, 703 A.2d 1315 (1998).

We reject appellee's contention regarding the point in time to be used for cap statute purposes when dealing with noneconomic damages for mesothelioma and accept appellants' position on this issue. Consequently, the trial court erred in its jury instruction: the critical point in time that was posed to the jury should not have been whether appellee had experienced *cellular change* before July 1, 1986; the question should

have instead pertained to whether appellee had *contracted mesothelioma* before July 1, 1986.

### III Dr. Dement's expert testimony

Appellants contend that the trial court, by allowing Dr. Dement to testify concerning the work of Dr. Longo, improperly allowed the introduction of inadmissible hearsay. Appellants further contend that the trial court erred by allowing Dr. Dement to testify outside of his area of expertise based on this allegedly inadmissible hearsay. A motion *in limine* was filed raising the issue of whether the report by Dr. Longo was of the type relied upon by experts in a particular field so as to be admissible under Maryland Rule 5–703(a).[4] At the hearing on this motion, the following occurred:

> The Court: The next is Lorillard's motion to exclude Dr. William Longo's testimony and evidence experiments conducted by MAS.
>
> Mr. Geary [Counsel for Lorillard]: We would adopt appropriate Maryland law and run with it. Your Honor I think what we would suggest on that issue, Your Honor, as we approach the day when Dr. Longo is going to testify, which I think is several weeks off, we might discuss that issue, but I don't think we will approach the issue at this time.
>
> The Court: *You are withdrawing your motion then?*
>
> Mr. Geary: Your Honor, that is correct.

(Emphasis supplied.)

It is thus clear that appellants had withdrawn their motion *in limine*. Before Dr. Dement actually began to testify, Lorillard preserved this issue for appeal, as it had requested

---

4. RULE 5–703. BASES OF OPINION TESTIMONY BY EXPERTS (a) In General.

 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

and was granted a continuing objection to any reference to Dr. Longo's work. H & V did not ask for a continuing objection, and did not join in on Lorillard's continuing objection. H & V's failure to preserve this contention is irrelevant, however, as we have already ruled that its motion to dismiss for lack of personal jurisdiction should have been granted. The continuing objection by Lorillard was granted after Mr. Geary (counsel for Lorillard) stated:

> [W]e have some criticisms of what [Dr. Longo] did. Without him being here, we won't be able to cross-examine him, but we understand other witnesses, including Dr. Dement today, will talk about the work of Dr. Longo, what sort of materials have been provided to him. And our objection, Your Honor, is that that would be pure hearsay.

Continuing objections have only recently become a recognized part of Maryland trial practice. Rule 2–517(b) provides that, at the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope. *Schreiber v. Cherry Hill Construction Co., Inc.,* 105 Md.App. 462, 482, 660 A.2d 970, *cert. denied,* 340 Md. 500, 667 A.2d 341 (1995). We find that the continuing objection in this instance was specific and that the testimony being objected to was within the scope of this objection.

Dr. Dement was properly offered as an expert, at which time the trial judge asked appellants' counsel whether they wished to cross-examine the doctor regarding his qualifications. Appellants declined to do so. Dr. Dement testified as to several matters before he was questioned about Dr. Longo's publication. That particular questioning transpired as follows:

> Q: I want to ask you a little bit about Kent cigarettes. Can you tell us, Doctor, whether or not you are familiar with the fact that, during the period of time from 1952 to 1956, Kent cigarettes were made with a micronite filter?

A: I am certainly familiar with that from some published reports, yes

Q: What is your familiarity, Doctor?

A: Well, I'm familiar with the publications, first of all, that looked at workers in the factory that actually made the filter, some epidemiology studies. And there is also a study by Dr. Longo published in the literature that reviewed that circumstance and also release of fibers as well.

Q: You have reviewed the Dr. Longo study?

A: I have.

Q: And the jury has heard testimony about Kent cigarette makers' attempts to reduce or eliminate mineral fiber exposure from the cigarette smoke. What does Dr. Longo's study tell us in that regard?

A: Well, Dr. Longo's studies demonstrated that these filters, these cigarette filters were—released fibers in its experimental circumstances, so they certainly released fibers that would be in the smoke.

Q: It seems to make common sense to me, but I will ask the question anyway. If the cigarette fibers are releasing fibers in the smoke, where are those fibers going?

Mr. Geary: Your honor, I object. It is argumentative.

The Court: I will strike the portion regarding common sense. The balance is overruled.

A: Of course, smoke is designed to be inhaled. And if it comes in the smoke, it is going to be inhaled.

Q: Doctor, is the inhalation of crocidolite fibers a hazard to the health of human beings?

A: In my opinion, yes, sir.

Q: And what do you base that on?

A: The epidemiology, published information.

Q: In that scenario where the human being is inhaling the fibers directly from the cigarette filter, is there any

safe level of asbestos that that individual can inhale, crocidolite asbestos, in your opinion, Doctor?

A: No. There is no—again, there is no established threshold below which there is no risk of disease.

Appellee argues that, even if Dr. Dement's testimony was erroneously admitted over proper objections, the jury's verdict should be affirmed because it was effectively cumulative and, therefore, harmless error, as other evidence admitted at trial produced the same results. As examples, appellee cites to the testimonies by Dr. Brody and Dr. Rubin, as well as the study by the Fullam Laboratory.[5] It is, of course, true that the erroneous admission of evidence will not justify reversal unless the complaining party can show that the admission was prejudicial. *Kapiloff v. Locke*, 276 Md. 466, 472, 348 A.2d 697 (1975); *William F. Klingensmith, Inc. v. David H. Snell Landscape Contractor, Inc.*, 265 Md. 654, 662, 291 A.2d 56 (1972); *McKay v. Paulson*, 211 Md. 90, 126 A.2d 296 (1956). However, it is also clear that this Court will not hesitate to reverse when hearsay evidence is erroneously admitted and prejudice is shown. *Kapiloff*, 276 Md. at 472, 348 A.2d 697. The burden of proving prejudice in a civil case is on the complaining party, here, the appellants. *Klingensmith*, 265 Md. at 662, 291 A.2d 56; *M.A. Realty v. State Roads*, 247 Md. 522, 527, 233 A.2d 793 (1967); *State Roads Comm. v. Kuenne*, 240 Md. 232, 235, 213 A.2d 567 (1965).

In the present case, we do not believe that appellants have met their burden of proving prejudice. Appellee has shown that the admission of Dr. Dement's testimony was in fact harmless error, and does not constitute grounds for reversal. We need only look to testimony by Dr. Rubin on the subject to arrive at this conclusion. The relevant portion of Dr. Rubin's testimony adduced:

---

5. We will not consider evidence adduced by the Fullam laboratory studies because this evidence was raised at trial against H & V. H & V will be dismissed from this suit, due to lack of personal jurisdiction. Consequently, the evidence brought forth against H & V, namely, the Fullam laboratory study, will not be admissible against Lorillard.

Q: ... do you have an opinion to a reasonable medical certainty as to whether or not Mr. Connor's exposure to Kent cigarettes was a substantial contributing factor in his developing of mesothelioma?

A: Yes, I do.

Q: And what is your opinion?

A: My opinion is that it was a substantial contributing factor to his development of mesothelioma.

Q: What is the basis of that, Doctor?

A: The basis is that this—first of all, we know that crocidolite is a potent carcinogen, as we have talked earlier, the most potent or among the most potent of the asbestos fibers in producing cancer. This was asbestos that was put up directly against his respiratory tract that he was breathing through. And I think it is highly likely, given that information that there were asbestos fibers that were released from these filters that were respirable, that were deposited into his respiratory tract and, therefore, contributed to the asbestos burden in his lung that ultimately led to his development of mesothelioma.

Thus, although the trial judge may have erroneously admitted Dr. Dement's testimony, this was harmless error, as there was other testimony that used similar language and produced similar results.

**IV Sufficiency of Evidence relating to Kent filters**

Appellants filed Motions for Judgment and/or for New Trial on two grounds involving the Kent filters. First, appellants contend that appellee did not produce sufficient evidence that Kent cigarettes actually caused his disease, as there was doubt raised by appellants as to whether he smoked the cigarettes at a time when the asbestos filters were being used. Second, appellants contend that, assuming he did actually smoke the cigarettes with the asbestos filters, appellee nonetheless failed to introduce evidence that the Kent filter

released asbestos in amounts sufficient to cause his mesothelioma.

There was testimony adduced at trial that supported appellee's contention that Kent cigarettes caused his disease, and that he smoked Kent cigarettes at a time when they contained asbestos filters. That matter is beyond review. The jury had an opportunity to assess appellee's credibility, as well as the credibility of his witnesses. Appellants had an opportunity at trial to question appellee and his witnesses regarding these claims. Whether testimony at trial was credible goes to the weight of the evidence, rather than its sufficiency. *See Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991). Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *Id.; McKinney v. State,* 82 Md.App. 111, 117, 570 A.2d 360, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990). In performing this role, the fact-finder has the discretion to decide which evidence to credit and which to reject. *See Velez v. State,* 106 Md.App. 194, 202, 664 A.2d 387 (1995), *cert. denied,* 341 Md. 173, 669 A.2d 1361 (1996) (" '[I]t is the exclusive function of the jury to draw reasonable inferences from proven facts.' " (quoting *McMillian,* 325 Md. at 290, 600 A.2d 430 (1992)). In this regard, it may believe part of a particular witness's testimony but disbelieve other parts. *See Pugh v. State,* 103 Md.App. 624, 651, 654 A.2d 888, *cert. denied,* 339 Md. 355, 663 A.2d 73 (1995).

The jury was free to believe all, part, or none of the testimony. *See Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *vacated and remanded on other grounds,* 308 Md. 208, 517 A.2d 1105 (1986). The trial court did not err in denying appellants' motion for judgment and/or new trial due to insufficient evidence produced by appellee.

## V Motion to Revise or Reopen Judgment/Exhumation of Body

Appellants contend that the trial court erred in denying their motion to reopen and revise the judgment and to

dismiss appellee's claims based on the refusal by appellee's family and counsel to preserve appellee's lung tissue as requested by appellants. Appellants argue that availability of the lung tissue would have presented appellants with an opportunity to analyze the fiber burden of the tissue in order to determine causation of the mesothelioma. Appellants further contend that the trial court erred in denying appellants' alternative request for an order to exhume plaintiff's body so that the lung tissue could be obtained and tested. Appellants accuse appellee of deliberate spoliation of the evidence resulting from the burial of plaintiff's body without the removal and testing of plaintiff's lung tissue.

Court orders denying motions are reviewed on an abuse of discretion standard. *Cooper v. Sacco et al.,* 357 Md. 622, 745 A.2d 1074 (2000). Appellants have failed to meet their burden to demonstrate that the trial court abused its discretion by denying their requests.

Appellants have presented not the slightest suspicion of a deliberate spoliation of evidence; appellants astoundingly compare the burial of a loved one to the destruction of documents. In *Klupt v. Krongard,* 126 Md.App. 179, 728 A.2d 727 (1999), this Court identified the elements that must be established in order to demonstrate that there has been a destruction of evidence. The *Klupt* Court reiterated a recent decision of the United States District Court for Maryland, which clearly laid out the consensus rules for sanctioning destruction of evidence. *See White v. Office of the Public Defender,* 170 F.R.D. 138, 147–48 (D.Md.1997). The *White* Court identified four elements generally regarded as being prerequisite to a court's imposition of spoliation sanctions: (1) An act of destruction; (2) Discoverability of the evidence; (3) An intent to destroy the evidence; and (4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is fairly perceived as imminent. *Id.* at 147.

Appellee's family, in their efforts to respect the rights of the deceased, vestigial though they be, understandingly shrunk back from appellants' requests to exhume and disfigure the deceased plaintiff's body. We concede that many dollars are

contingent upon the outcome of this case; nonetheless, we do not place cash before conscience. Appellants were certainly aware of the lethal nature of mesothelioma, and could have taken the procedural steps necessary, earlier in this action, in order to obtain or preserve the evidence they desired without having to ask for the exhumation of the body. They elected not to go through discovery procedures to request a biopsy or for the preservation of the lung tissue. We find it unconscionable that appellants now denounce appellee's next of kin and counsel for "deliberate spoliation of evidence," simply because they arranged for their loved-one's burial.

Although plaintiff's body had obvious evidentiary value in this case, we perceive no "deliberate spoliation of evidence." The deceased's family properly disposed of the body as would be expected in the circumstances. We affirm the trial court's rulings regarding the denial of appellants' motions to review or reopen judgment and to dismiss, or, in the alternative, for exhumation of the plaintiff's body.

## VI Settlement Credits under Tortfeasor Act

Appellants contend that the trial court erred in denying them credit pursuant to the Maryland Uniform Contribution Among Joint Tort–Feasors Act, Md.Code (1974, 1998 Repl. Vol.), C.J. § 3–1404. This contention is based on the fact that appellee entered into settlements with several of the original "occupational defendants." The Uniform Act, in relevant part, provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

*Id.* § 3–1404.

The Act defines "joint tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to

person or property, whether or not judgment has been recovered against all or some of them." *Id.* § 3–1401. The purpose of the Act is to prevent double recovery. The amount recoverable from the non-settling defendant when added to the amount recoverable from the settling defendant cannot exceed the plaintiff's verdict. *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 126, 604 A.2d 47 (1992); *see Martinez v. Lopez,* 300 Md. 91, 476 A.2d 197 (1984). The drafters intended this Act to deal with the common liability of two or more joint tortfeasors and not with the unique liability of an individual wrongdoer. *Armstrong,* 326 Md. at 127, 604 A.2d 47.

At common law, a plaintiff who settled a claim with one joint tortfeasor would lose his right to sue other joint tortfeasors on the same claim. *See Loh v. Safeway Stores, Inc.,* 47 Md.App. 110, 117, 422 A.2d 16 (1980). To avoid this stringent result, a number of states, including Maryland, enacted the Uniform Contribution Among Joint Tort–Feasors Act in order to encourage settlements by allowing a plaintiff to maintain his claim against a non-settling joint tortfeasor when he settles with another joint tortfeasor and signs a release. *See id.* at 117–18, 422 A.2d 16.

Appellants, in an effort to have the judgments against them reduced pursuant to the settlement amounts paid by the settling defendants, claim that the settling defendants should be considered joint tortfeasors. Their contention is based on the premise that the settling defendants' alleged negligence should be used in determining tortfeasor status for purposes of making the adjustment under the Act.

As the Court of Appeals recognized, "[t]he [A]ct does not specify the test of liability. Clearly, something short of an actual judgment will suffice." *Swigert v. Welk,* 213 Md. 613, 619, 133 A.2d 428 (1957). The fact, however, that a party has been sued or threatened with suit is not enough to establish joint tortfeasor status. *Jacobs v. Flynn,* 131 Md. App. 342, 374–75, 749 A.2d 174 (2000). *See Owens–Corning Fiberglas, Corp. v. Garrett,* 343 Md. 500, 531–32, 682 A.2d 1143 (1996). Tortfeasor status, in the absence of adjudication,

generally rests on admission by the purported tortfeasor of such status. Thus, a party will be considered a joint tortfeasor when it admits joint tortfeasor status in a settlement agreement, *see Martinez,* 300 Md. at 94–95, 476 A.2d 197, or if a default judgment has been entered against a party. *See Porter Hayden Co. v. Bullinger,* 350 Md. 452, 473–74, 713 A.2d 962 (1998) (because a default judgment is considered an admission of liability, it is sufficient to establish joint tortfeasor status). One will not be considered a joint tortfeasor, however, merely because he or she enters a settlement and pays money. *See Garrett,* 343 Md. at 532, 682 A.2d 1143. When the settling parties specify in the release that the settling party shall not be considered a joint tortfeasor, monies paid on account of such settlement will be considered merely volunteer payments; a non-settling defendant judicially determined to be liable will not be entitled to a reduction of the damages awarded against it on account of the consideration paid by the settling party. *See id.* at 531–33, 682 A.2d 1143; *Collier v. Eagle–Picher Indus., Inc.,* 86 Md.App. 38, 57, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991).

 There was no adjudication regarding the liability of the settling defendants, and appellants have not provided this Court with evidence regarding any admission by those settling defendants. The settlement agreement, in the absence of an actual admission by those parties, is dispositive of this issue. As the record now before us lacks the information necessary for this determination, we remand this issue to the circuit court in order to review the settlement agreements between appellee and the settling defendants. Such review shall take place solely to determine whether those agreements specify a joint tortfeasor status between the defendants, or, in the alternative, whether they contain admissions of such or of general liability by the settling defendants.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

COSTS TO BE PAID ONE–HALF BY APPELLANTS
AND ONE–HALF BY APPELLEE.