# CHARLTON BROS. TRANSPORTATION CO., INC., ET AL. *v.* WILLIAM E. GARRETTSON

[No. 75, October Term, 1946.]

*Decided March 14, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, HENDERSON, and MARKELL, JJ.

*Lester H. Crowther* for the appellant, Charlton Bros.

*Philip S. Ball*, with whom was *James J. Lindsay* on the brief, for the appellant, Baltimore Transit Company.

*Daniel E. Klein* for the appellee.

MARKELL, J., delivered the opinion of the Court.

On the afternoon of May 28, 1945, about five or six o'clock, a street car passenger was injured by a collision, at the intersection of Paca and Greene Streets, between a new green one-man No. 17 street car, running west (more nearly southwest) on Paca Street and a 43 foot tractor-trailer going south (*i. e.*, southeast) on Greene Street. Plaintiff sued the Transit Company and Charlton, owner of the tractor-trailer, and obtained judgment against both. Both have appealed. Such crossing collisions seldom, if ever, are pure accidents; it is not claimed that this one was. Each defendant contends that it was caused by the negligence of the other defendant. Plaintiff claims, and the jury found, it was caused by concurrent negligence of both defendants. No question of contributory negligence is presented.

The principal questions are whether there is legally sufficient evidence to show negligence of each defendant which caused or contributed to plaintiff's injuries. As we cannot review the verdict on the facts, it is unnecessary to recite the evidence (much of which is contradictory) beyond mentioning that which, with permissible inferences, is most favorable to plaintiff (and to each defendant as against the other), in order to determine whether it is legally sufficient. The facts and the questions of law concerning the collision are not novel.

Paca Street, which at and above Camden Street runs due north and south, below Camden Street turns toward

the west and runs perpendicular to Greene Street. The curve ends 300 feet east of Greene Street. At and above the intersection with Paca Street, Greene Street is a narrow one-way street for south bound traffic. At the crossing Greene Street is 17 feet 9 inches wide from curb to curb, 29 feet 7 inches from building line to building line. Paca Street is 35 feet 8½ inches from curb to curb, 59 feet 1½ inches from building line to building line. There is a grocery store on the northeast (north) corner. Greene Street, though a thoroughfare, is not a street car stop.

Charlton's truck driver says, when he got to Paca Street he "glanced to the left and right, and the street car had just come around the corner." When he first saw the street car his bumper was "just about at the curb line." He was five feet back of his bumper. He was going five or six miles an hour, did not stop but "started on across" Paca Street, increasing his speed to between fourteen and sixteen miles an hour. When the collision occurred his front bumper was at the south building line of Paca Street. The car struck the trailer between the center and the rear and pushed it around so that it struck the curb and the telephone pole at the corner. After he started across the street he "never paid no more attention" to the street car until he "heard the wheels squealing" on the track; his tractor was then "just about at the curb." When he heard the wheels "squeal," he "guesses" the car was about 40 feet away from him. When the street car had rounded the corner, "it was coming right at me, you couldn't tell whether it was coming fast or not."

The helper on the truck says, "as we had been crossing, well, I had been watching the street car through the window, and I guess when we got 30 or 40 feet away, I took notice he reached down and grabbed, I think they call it the emergency bar, to lock the wheels." As the car approached from the curve and "got closer, I got kind of worried about it, I knew it was going to hit us. * * * I guess just before he hit us, he was doing about 30

miles an hour"—within 10 miles more or less. As the driver started across the street, "he speeded up to get out of the way of the street car." "He thought the same as I, he didn't think the street car was going that fast." "* * * when he got about 40 or 50 feet from us, that's when I really started paying attention to it, and I guess about 30 or 40 feet when his wheels were locked."

An alleged eye-witness, standing on the northwest (west) corner, says the car "was coming at a terrific speed," that about 35 or 40 feet from Greene Street the motorman "applied on his brakes" and his wheels locked and "she skidded or slid"; that when the car was coming towards him, the tractor-trailer was in front of him, but "he cleared me." Transit Company argues that, because the tractor-trailer was in front of him, the witness could not have seen the car. What could or could not be seen from the street corner in front, behind or between the tractor-trailer does not seem to us so demonstrable as to warrant us in disregarding this testimony as a geometrical impossibility. A passenger on the car testified that the motorman "was doing around 35 to 65 miles," and as he was traveling toward Greene Street was not looking ahead, but was talking and had his head turned behind him. The motorman says, he was going 15 miles an hour; at that speed you can stop in 50 feet; he was about 35 or 40 feet from Greene Street when he first saw the tractor-trailer, which had just started from the north building line; he applied his brakes, rang his gong, put the car in reverse, and "the momentum of the car went right into the trailer"; he was not talking immediately prior to the accident.

Plaintiff was seated on the right hand side of the car, four or five seats from the rear. He was looking out the window to the right. He first saw the truck while the car was approximately 50 feet from it. The truck was in front of the street car. He could see the rear of the trailer. The motorman was going "rather fast."

Witnesses for the Transit Company, passengers, corroborated the motorman's testimony and contradicted tes-

timony above mentioned. The weight of the evidence was for the jury and was reviewable only on motion for new trial—not by us. For present purposes we must assume the truth of the testimony against the respective defendants.

Plaintiff is a book binder. He had been operated on for hernia on both the right and left sides in March, 1945, and had been back at work about two weeks before the collision. The collision threw him from his seat, "up over the other seat, with that bar that comes across there, right on my incision, which caused me terrible pain." The motorman offered to take him to the hospital, but he preferred to go to his own physician, Dr. Wilkerson, who had operated on him. He went in a taxicab to Dr. Wilkerson's office and was given a thorough examination and told to wear a supporter, which he did. He is still wearing it. He went home and was away from work a couple of days. He had to go back to Dr. Wilkerson's office every two weeks, and still goes back. He now has a hernia on the left side "to the size of your fist, a good sized orange." He expects to have another operation. Three or four weeks after the collision a lump first appeared on his left side. It has been getting larger all the time. From the time of the collision until the lump appeared, he had very severe pains in the groin.

Dr. Wilkerson on the day of the collision found tenderness in both groins, in the region of the operative scars. Plaintiff complained two or three weeks later of a lump in the groin; Dr. Wilkerson could not then find the lump, but there was still tenderness. He did not then feel that plaintiff had a hernia, but told plaintiff the possibility that a new hernia was beginning. The latter part of July there was some bulging on the left side. Dr. Wilkerson still felt it was probably a muscle injury, which would clear up. The lump is "so big now it is as big as your two fists, and it is quite an extensive recurrent hernia at this time." Asked "from the history and your examination, and so forth, what, in your opinion, is the causal connection between the accident he described to you and

the condition as you found it, and as it exists now," he answered, over objection, that from the "injury which he describes to me where he was thrown over a seat in a street car and then from his symptoms at that time, and from what I observed over the many times that I examined him, and up until this time, I feel that the accident produced a recurrent hernia." The only curative treatment is an operation on this hernia. The operation will be quite a formidable one, involving an incision from the groin to the knee, to take tissue from the leg to put it in the hernia area. He does not believe there is "more than a fifty-fifty chance" of a cure. December 4th was the first time he definitely determined plaintiff had a recurrent hernia. Ten per cent. of the hernias operated on recur without an accident, but this particular type of hernia that plaintiff had is a direct hernia, i. e., one that must be acquired, and is ordinarily due to some abdominal trauma. An indirect hernia is one that "has all the elements at birth to occur." Dr. Wilkerson believes that if plaintiff's "story is true that he had this accident, and what happened, and what transpired later, I think that this recurrent hernia is due to that accident."

The legal sufficiency of the evidence against Charlton is clear. The only question that might be debatable is not before us, viz., whether on the testimony of Charlton's own witnesses, Charlton was guilty of negligence as a matter of law. This court has frequently held that the driver of a milk wagon (*Heying v. United Railways & Electric Co.*, 100 Md. 281, 59 A. 667) or a tractor-trailer (*National Hauling Contractors v. Baltimore Transit Co.*, 185 Md. 161, 44 A. 2d 450) or some other vehicle who tried to cross in front of a street car and miscalculated his chance of success, was guilty of negligence as a matter of law. In other cases, different on the facts, the question of the driver's negligence was a question of fact for the jury. In *Davidson Transfer & Storage Co. v. Baltimore Transit Co.*, 183 Md. 253, 37 A. 2d 326, a non-jury case, the trial court held the truck driver guilty of contributory negligence. This court took a dif-

ferent view of the facts and the credibility of testimony, and held the truck driver free from contributory negligence; it was not held that the evidence was legally insufficient to show negligence of the truck driver.

The case against the Transit Company is closer. The Transit Company owes its passengers the highest degree of care consistent with the nature of its undertaking. Its undertaking is to furnish "rapid transit." If its cars were stopped or even slowed down to avoid every possibility that somebody might leave a place of safety to cross in front of a car, it might be exercising the highest degree of care, but it would not be performing its undertaking. *E. H. Koester Bakery Co. v. Poller,* 187 Md. 324, 50 A. 2d 234. Nevertheless a motorman, like the driver of an automobile, must recognize the possibility that other drivers may cross negligently (*Clautice v. Murphy,* 180 Md. 558, 563, 26 A. 2d 406) and must be alert at all times to avoid accidents.

The Transit Company argues that from the Charlton testimony the street car must have gone 300 feet in two seconds, an impossible speed of more than 100 miles an hour, and that this testimony may therefore be wholly disregarded. Assuming, without deciding, that this computation is warranted on the face of the evidence, this argument ascribes mathematical exactness to estimates of speed and distance which are not susceptible of such exactness. If the car was nearer than the curve on Paca Street when the truck started across, or if the speed of the truck was less than estimated, or if both these possibilities were facts, then the car may still have been going at an excessive speed, as other witnesses testify. If plaintiff saw the truck in front of the car at a distance of 50 feet, then the truck must have been considerably more than 30 or 40 feet away when it left the north building line. Furthermore, if the collision happened in a "split second," as one witness said, momentary inattention of the motorman might be sufficient to make the difference between striking the trailer near the rear and not striking it at all. In *Baltimore Transit Co. v.*

*State, to Use of Schriefer,* 184 Md. 250, 40 A. 2d. 678, in which a truck turned across a street car track into an alley and was struck by a street car, this court held that there was evidence of excessive speed and lack of control of the street car, and affirmed a judgment against both the Transit Company and the owner of the truck. In the Davidson case, *supra,* this court held that the collision was due solely to excessive speed of the car, without negligence of the truck driver. In the National Hauling Contractors Co. case, *supra,* it was held that the truck driver was guilty of contributory negligence; it was not held that the evidence was legally insufficient to show negligence of the Transit Company. We think the evidence was legally sufficient in the instant case to show negligence of the Transit Company.

The defendants contend that there was reversible error in charging the jury that it might consider "whether the injuries will be permanent in their effect" and in overruling objections to testimony of Dr. Wilkerson, *supra,* as to causal connection between the accident and plaintiff's present condition, as to the chance of a cure, and as to a "direct hernia." It is contended that the surgeon did not hear the testimony in the case, that "the history and so forth" are too vague to form the basis of opinion evidence, that the "fifty-fifty chance" of cure is mere possibility, not probability, of permanent injury, and that the fact that the present hernia is a "direct hernia" is something the surgeon could not have found from observation alone.

Dr. Wilkerson's testimony was based on unusually extensive first-hand acquaintance with plaintiff's physical condition before and after the collision, plus the fact that plaintiff was struck in the groin in a collision. It was not necessary for him to hear the testimony. *Yellow Cab Co. v. Henderson,* 183 Md. 546, 39 A. 2d 546. The "history and so forth," as recited in his testimony, was in accord with plaintiff's testimony. The only alleged discrepancy is that (it is contended) his testimony assumed plaintiff was wearing a support before the collision and

plaintiff's testimony shows the contrary. Any such discrepancy is immaterial. It is not suggested that plaintiff was guilty of contributory negligence in not wearing the support. The absence of the support could not make it less likely that the blow caused the present hernia. Whether a surgeon can find from observation alone that a hernia is a "direct hernia" is not shown by evidence and is not within our judicial knowledge. If the testimony on this point was not factual testimony, it was legitimate expansion of previous opinion testimony. The defendants were at liberty to explore the subject further on cross-examination or by rebuttal evidence.

The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc, propter hoc* is a recognized logical fallacy, a *non sequitur*. But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause. *Baltimore City Pass. Ry. Co. v. Kemp*, 61 Md. 74; *State of Maryland, to Use of Goralski v. General Stevedoring Co.*, D. C., 213 F. 51, 61, 62, affirmed *Joseph R. Foard Co. v. State of Maryland*, 4 Cir., 219 F. 827, 830-832. We think the surgeon's testimony was admissible and there was legally sufficient evidence that the collision caused the present hernia. We are not required or permitted to assume that the collision and the new hernia were a mere coincidence and that the hernia would have recurred if there had been no collision.

There is also evidence of permanent injury. Plaintiff *is* permanently injured, unless he is cured by a formidable operation, which offers a 50 per cent. chance of cure. Before the collision his condition involved a 10 per cent. risk of recurrence. His present condition, *if* he undergoes another operation, involves a 50 per cent. risk of recurrence. This increase in hazard is itself a permanent injury. Expert testimony hardly seems necessary to show that such an operation would leave plaintiff in a permanently weaker condition.

Charlton alleges reversible error in refusal to strike out testimony of a Transit Company witness, a passenger, that before the accident she had not observed anything with reference to the speed of the street car, but she thought "we are going a moderate speed." On cross-examination by Charlton she said "I noticed that we weren't going too fast." Failure to observe any immoderate speed might indicate moderate speed.

*Judgment affirmed, with costs.*