805 A.2d 1148

**Ruth DITTO, Personal Representative of the Estate of Victor C. Ditto, Sr.**

v.

**David W. STONEBERGER, et al.**

No. 2374, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Aug. 28, 2002.

Affirmed.

470

472

474

John J. O'Neill, Rockville, for appellant.

Stephen L. Prevas (Prevas and Prevas on the brief), Baltimore, for appellees.

Argued before SALMON, SONNER and CHARLES E. MOYLAN, JR. (Ret., Specially Assigned), JJ.

SALMON, Judge.

On July 25, 1998, Edward Stoneberger was hit in the head and killed by a metal pipe that fell from the roof of a two-story feed mill building owned by Richard and Helen Reynolds. At the time of the accident, the building was being demolished by Victor Ditto.

Mr. Stoneberger was survived by a sister, forty-four year old Mary Stoneberger, and a niece, sixteen year old Candi Blessing. The personal representatives of Mr. Stoneberger's estate filed a survivorship action in the Circuit Court for Washington County against Mr. Ditto and the owners of the building; joined in the same suit was a claim for wrongful

death filed by Mary Stoneberger individually and as the mother of Candi Blessing.

After a trial, the jury absolved the owners of any responsibility for the accident but found that Mr. Ditto's negligence caused Mr. Stoneberger's death. Damages were awarded to the estate as follows:

| | |
|---|---|
| Medical expenses: | $ 45,673.35 |
| Funeral expenses: | 3,146.75 |
| Pain and suffering: | 300,000.00 |
| | |
| Total: | $348,820.10 |

In addition, the jury awarded Mary Stoneberger and Candi Blessing $50,000 each on their respective wrongful death claims.

In this appeal, appellant, Ruth Ditto, as personal representative of the estate of Victor Ditto, raises six issues:

1. Whether, at the time of his death, either Mary Stoneberger or Candi Blessing was substantially dependent on Edward Stoneberger;

2. Whether the trial court erred in failing to instruct the jury concerning the duty, or lack thereof, owed to a trespasser;

3. Whether sufficient evidence was presented to support a finding that Edward Stoneberger endured conscious pain and suffering as a result of the subject accident;

4. Whether the trial court erred in accepting Roger Campbell as an expert on the subject of occupational safety and the operation of cranes;

5. Whether the trial court erred in allowing counsel for the appellee to use misleading photographs; and

6. Whether the trial court erred in allowing Patsy Hays, the caregiver for Mary Stoneberger, Candi Blessing, and the deceased to introduce Social Security Administration records.

### I. *UNDISPUTED FACTS*

Victor Ditto was hired by Richard and Helen Reynolds to demolish a two-story feed mill that the Reynoldses owned. The feed mill was located at the intersection of Railroad Lane and Main Street in Smithsburg, Washington County, Maryland. The front of the building faced Main Street, and railroad tracks ran along the side of the building opposite Railroad Lane.

Edward Stoneberger lived on Main Street near the feed mill. Residing with him was his sister, Mary Stoneberger, and Mary's teen-aged daughter, Candi Blessing.

On the afternoon of July 25, 1998, Mr. Ditto, age 82, was operating a crane, using the boom of the crane to knock down the feed mill building. According to Mr. Ditto's deposition testimony that was introduced at trial,[1] Mr. Ditto was manipulating the boom to knock down the roof of the feed mill building when he struck a long, angled metal pipe.

About five minutes before the pipe was struck, Edward Stoneberger had stopped on property located across the street from where the demolition was taking place to speak with Clarence Miller. Miller was one of the people hired by Mr. Ditto to spray the feed mill in order to dampen the dust caused by the demolition. Mr. Stoneberger and Miller commenced talking while standing in the backyard of a brownstone located directly across Railroad Lane from the demolition site. When the boom struck the long metal pipe, the pipe broke loose, slid down one side of the feed mill roof, and fell, landing on Railroad Lane, bouncing up, and then striking Mr. Stoneberger in the head. Mr. Stoneberger was transported to Washington County Hospital where, after a 16 day interlude, he died.

### II. *THE CONSTRUCTION SITE*

There was conflicting testimony presented at trial as to whether barriers, caution tape, and "No Trespassing" signs

---

1. A videotape of Victor Ditto's deposition was shown to the jury as part of the plaintiffs' case-in-chief because Mr. Ditto died prior to trial.

were in place around the demolition site. Randall Schroyer, another man hired by Mr. Ditto to hose down the feed mill during the demolition, testified that barricades and tape were placed across Railroad Lane and Main Street. According to Mr. Schroyer, there were also "No Trespassing" signs in the front windows of the brownstone and feed mill buildings.

Robert Rogers, Jr., the manager of the Smithsburg Market, located close to the intersection of Railroad Lane and Main Street, testified that he saw a trestle and tape across Railroad Lane. The trestle was about six feet long and was placed in the center of the road. The ribbon or tape blocking the roadway was attached to one end of the trestle and to the feed mill building. Richard Grove, who was at the intersection of Railroad Lane and Main Street on the morning of July 25, 1998, saw trestles across Railroad Lane and ribbon strung across Railroad Lane on the Main Street side. He also remembered seeing a "No Trespassing" sign on the feed mill building.

John Morin, the office manager for Victor Ditto Steel Erectors and Riggers, testified that Mr. Ditto called him on the evening of July 24, 1998, asking him to bring "No Trespassing" signs and caution tape to the demolition site. Mr. Morin did as requested that same evening.

Clarence Miller, who was chatting with Edward Stoneberger when the accident occurred, testified that he did not recall any barricades or tape across Railroad Lane. Jason Sturm, the paramedic who came to the scene immediately after the accident testified that he saw no barriers when he arrived. Ann Boswell, a neighbor of the Stonebergers, testified that around 8:00 a.m. on July 25, 1998, she left her house to buy a newspaper. On her way back home, she saw no barriers or caution tape. Timothy Beal, a safety professional who was visiting a friend in Smithsburg between 9 a.m. and 10 a.m. on July 25, 1998, testified that there was a barricade present, but it was not blocking traffic on Railroad Lane.

## III. *EVIDENCE REGARDING DAMAGES*

Edward Stoneberger, who was mentally retarded, was forty-seven years old when he died. The house he lived in was given to him and his sister, Mary Stoneberger, and Candi Blessing, by Edward Stoneberger's mother.

Mary Stoneberger is also retarded. She was forty-four and her daughter, Candi, was sixteen at the time of Edward's death. All three were recipients of Social Security Disability benefits.

A neighbor, Patsy Hays, managed the financial affairs of Edward and Mary Stoneberger and Candi Blessing. The Social Security Administration mailed Edward and Candi's checks directly to Ms. Hays, in her capacity as their caregiver. Mary's check was mailed to her, but Ms. Hays accompanied Mary to the bank to ensure it was deposited in the correct account.

Edward's monthly check was approximately $527, Mary's was $580, and Candi's was $354. Ms. Hays made sure that the three social security benefit checks were deposited in the bank each month. Once every third month, she would use the monies of one of the three checking accounts to pay certain of the household bills of all three individuals. Ms. Hays tried to split the fixed expenses evenly among the three as best she could, but Candi's check, because it was the smallest, was used only toward groceries, fuel, and electricity. When it was Candi's turn for her funds to be used, they had to be supplemented with monies from either Edward's or Mary's accounts.

Mary and Candi did the house cleaning, and sometimes Edward would help. Mary cooked the meals, and each took turns doing the grocery shopping with Ms. Hays's assistance.

Ms. Hays gave an estimate of the bills she paid for Edward, Mary, and Candi each month:

1) Fuel: $122.00
2) Telephone: $40.00
3) Cable: $30.00
4) Electric: $80.00–85.00

5) Water: $30.00

6) Groceries/Household Expenses: $600.00

In addition, on behalf of the three and out of common funds, she paid real estate taxes of $600 per year and fire insurance of $85 annually.

Total fixed monthly expenses were approximately $964. In addition to the fixed expenses, Edward, Mary, and Candi each had individual expenses for things like clothing, entertainment, medication, and hair cuts.

According to Ms. Hays, the deceased was "like a father-figure" to Candi; he took her for walks, bought her treats, etc.

## IV. MOTIONS BY APPELLANT

Prior to trial, appellant filed a motion in limine and/or motion to dismiss and/or motion for summary judgment seeking to dismiss the wrongful death action brought by Mary Stoneberger, individually, and as parent of Candi Blessing. The motion asserted that Mary and Candi were not substantially dependent on Edward, because both were receiving social security disability benefits and were self-supporting. Therefore, appellant argued, they had "no standing" to bring a wrongful death action. The trial court denied the motions.

After plaintiffs' case-in-chief and again at the close of all evidence, appellant made motions for judgment on the wrongful death counts. Appellant contended that no evidence had been admitted showing that either Mary or Candi were substantially dependent on the deceased. Appellant also argued that social security law prohibits anyone from using disability benefits to support another, and therefore it would be impermissible to allow the jury to decide the dependency issue. The trial court denied the motion.

## V. ANALYSIS

### ISSUE 1: Whether Mary Stoneberger or Candi Blessing Were Substantially Dependent on Edward Stoneberger

Appellant phrases this issue in terms of whether the "trial court err[ed] in failing to grant [a]ppellant's Motion in Limine

and/or Motion to Dismiss and/or Motion for Summary Judgment on the Wrongful Death Counts."

The motion to dismiss challenged the sufficiency of the allegations in the complaint. On appeal, appellant does not argue that the plaintiffs' complaint was either technically or substantively defective.

The *denial* of a motion for summary judgment, at least in this case, cannot be the basis for a successful appeal because the trial judge had the discretion to deny the motion even if the affidavits and other sworn material would have adequately supported the grant of summary judgment. *See Post v. Bregman*, 349 Md. 142, 158, 707 A.2d 806 (1998) (citing *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 28, 415 A.2d 582 (1980)). (Ordinarily, a court "does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits [and] this discretion exists even though the technical requirements for the entry of such a judgment have been met.")

A denial of a motion *in limine* to exclude evidence (such as the motion filed in this case) does not preserve an evidentiary issue for appeal. Rather, the party who made the motion to exclude evidence must make a contemporaneous objection at the time the evidence is introduced at trial. *Reed v. State*, 353 Md. 628, 637, 728 A.2d 195 (1999); *N.B.S., Inc. v. Harvey*, 121 Md.App. 334, 343, 709 A.2d 162 (1998). No contemporaneous objection was made as to evidence concerning dependency.

Nevertheless, at the conclusion of the entire case, pursuant to Maryland Rule 2–519(a), appellant did move for judgment on the wrongful death counts on the same grounds as set forth in her three pre-trial motions. Although appellant does not contend in her brief that the denial of that motion was error, we will overlook that technicality and decide the issue raised in the Rule 2–519(a) motion, because the issue was raised and decided below.

Maryland's Wrongful Death Statute reads, in pertinent part:

> (b) Secondary beneficiaries.—If there are no persons who qualify under subsection (a), an action shall be for the benefit of any person related to the deceased person by blood or marriage who was *substantially dependent* upon the deceased.

Md. Ann.Code, Cts. & Jud. Proc. § 3–904(b) (2001) (emphasis added). Prior to a 1997 amendment to the statute, a secondary beneficiary had to be "wholly" dependent on the deceased to recover wrongful death benefits.

Edward Stoneberger left no primary beneficiaries. Mary Stoneberger and Candi Blessing were related to the decedent by blood. Thus, we must decide whether the evidence presented was sufficient to allow a jury to find that either Mary Stoneberger or Candi Blessing (or both) were substantially dependent upon Edward Stoneberger.

There is no case law in Maryland interpreting the term "substantially dependent," as it is used in the wrongful death statute. Workers' compensation cases discuss dependency in terms of whether a relative is "wholly" or "partially" dependent on the earnings of the worker, but the term "substantially dependent" is not used in the workers' compensation statute. Those cases are, nevertheless, somewhat instructive.

The test of dependency in workers' compensation cases is "not whether a claimant was capable of supporting himself [or herself] without the earnings of the workman, but whether he [or she] did in fact rely upon such earnings for his [or her] livelihood, in whole or in part, under circumstances indicating an intent on the part of the workman to furnish such support." *Martin v. Beverage Capital Corp.,* 353 Md. 388, 403, 726 A.2d 728 (1999) (citing *Meyler v. Mayor & City Council of Baltimore,* 179 Md. 211, 217, 17 A.2d 762 (1941)).

The Court of Appeals defines "dependent," within the meaning of the Workers' Compensation Act, as "one who relies wholly or in part upon a workman for the reasonable

necessities of life at the time of his accidental injury." *Martin,* 353 Md. at 403, 726 A.2d 728 (citing *Mario Anello & Sons, Inc. v. Dunn,* 217 Md. 177, 180, 141 A.2d 731 (1958)). In construing "wholly dependent," the Court of Appeals has adopted the seemingly universal rule that:

"Total dependency exists where the dependent subsists entirely on the earnings of the workman; but in applying this rule courts have not deprived claimants of the rights of total dependents, when otherwise entitled thereto, *on account of temporary gratuitous services rendered them by others, or on account of occasional financial assistance received from other sources,* or on account of other minor considerations or benefits which do not substantially modify or change the general rule as above stated." (Emphasis added.)

*Martin,* 353 Md. at 404, 726 A.2d 728 (citing *Larkin v. Smith,* 183 Md. 274, 280, 37 A.2d 340 (1944)).

The Court of Appeals has found a claimant to be totally dependent on her deceased husband, even though she was employed at the time of his death, where that employment was temporary or occasional and the claimant's intention was to depend solely on her husband's income in the future as she had in the past. *Bethlehem–Fairfield Shipyard, Inc. v. Rosenthal,* 185 Md. 416, 427, 45 A.2d 79 (1945). The Court found a claimant to be totally dependent, even though she was separated from her spouse at the time of his death and collected weekly rent from a boarder; the Court reasoned that she nevertheless met the definition of total dependence because she received monthly support from her spouse. *Harvey v. George J. Roche & Son,* 148 Md. 363, 370, 129 A. 359 (1925).

In *Knibb v. Jackson,* 210 Md. 292, 123 A.2d 338 (1956), a minor brother, Joseph, was dependent on his deceased older brother, James, and the question was the extent of his dependency. Both brothers, one seventeen and the other thirteen-years-old, lived with their mother. *Id.* at 295, 123 A.2d 338. The mother received a weekly wage of $37, although her take home pay varied from $32 most weeks to $28 for the week

each month that her health insurance premium was deducted. *Id.* James, the older son, earned $35 per week. From his earnings, he gave his mother $22 per week-$7 for his board, $5 for his mother's use, and $10 for his younger brother, Joseph. *Id.*

The Court of Appeals concluded that the case was properly submitted to the jury for a determination of whether the Industrial Accident Commission was correct in finding Joseph totally dependent on James. *Id.* at 296, 123 A.2d 338. The Court said, however, that if the jury reached the conclusion that the earnings of the mother and the older brother were pooled for the common support of all three family members, then the jury must find that the younger brother was only partially dependent on his deceased older brother. *Id.* at 298, 123 A.2d 338. Because a jury instruction was not given to that effect, the Court of Appeals reversed and remanded the case. *Id.* at 300–01, 123 A.2d 338.

In *Mario Anello & Sons, Inc. v. Dunn,* the Court of Appeals found a woman (Mrs. Dunn) to be partially, rather than wholly, dependent on her deceased husband where the woman's earnings were pooled with her husband's and used to pay their bills. *Dunn,* 217 Md. at 182–83, 141 A.2d 731. Mrs. Dunn was employed as a sewing-machine operator. In 1954, she earned a total of $1,604.51 and in 1955, a total of $1,957.40. She earned an average take-home pay of $30 per week in January of 1956. Her husband earned an average weekly wage of $90. The Court said that "where the evidence, or any inferences fairly deducible from it, was legally sufficient to support a rational conclusion of total dependency . . ., this Court has held that the issue should be submitted to the jury. . . ." *Id.* at 181, 141 A.2d 731. "[W]here the facts are undisputed, [however,] and permit no inferences consistent with the existence of a supposed or asserted right, the existence of such a right is an unmixed question of law for the court. . . ." *Id.* In light of Ms. Dunn's "substantial contributions to the pool of her and her husband's wages for nearly two and one-half years extending to the date of his injury, and

the use of the funds for the support of the family," the Court determined that Mrs. Dunn was not wholly dependent on her husband as a matter of law. *Id.* at 182–83, 141 A.2d 731.

■ The compensation cases make it clear that *usually* a person who has pooled his or her income with a now-deceased (or injured) worker is not wholly dependent on the worker— but is partially dependent. *Mullan Construction Co. v. Day*, 218 Md. 581, 147 A.2d 756 (1959); *Dunn*, 217 Md. at 182–83, 141 A.2d 731, and *Knibb*, 210 Md. at 298, 123 A.2d 338. But when two people pool their incomes and the claimant's income is relatively minuscule compared with that of the injured worker, the claimant can still be deemed to be wholly dependent. *See Martin*, 353 Md. at 415, 726 A.2d 728 (surviving spouse deemed "wholly" dependent when her income, which she pooled with the income of her husband, was only eight percent of what her spouse earned at the time of his death). Therefore, if this were a worker's compensation case, it is clear that Mary Stoneberger and Candi Blessing would be deemed to be partially, not wholly, dependent on Edward Stoneberger.

Only a small handful of out-of-state cases, all decided prior to the Eisenhower administration, discuss "substantial dependency" in terms of wrongful death statutes. In 1952, the Superior Court of New Jersey considered whether a mother and father were dependents of their deceased eighteen-year-old daughter. *Bohrman v. Pennsylvania Railroad Co.*, 23 N.J.Super. 399, 93 A.2d 190 (1952). The father owned a beauty shop and he and his wife worked in the shop. While in high school, the daughter worked in her father's shop every afternoon after school, on Saturdays until noon, and a full six days per week during school vacations. She cleaned the shop, sterilized equipment, answered the telephone, made appointments, received payments, kept records, and assisted in servicing customers. The deceased daughter had graduated from high school in 1950 and intended to become a beauty operator. She was five weeks of training away from completing the beauty school course at the time of her death.

The pertinent statute provided: "The amount recovered in proceedings under this chapter shall be for the exclusive benefit of the widow, surviving husband, dependent children of the decedent, or the descendants of any such children, [or] *the dependent natural parents of the decedent, . . . ." Id.* at 192–93. In determining the meaning of "dependent," the Superior Court of New Jersey turned to the dictionary definitions as well as other courts' interpretations of the word. *Id.* The court came to the conclusion that "The degree of dependence is not as important as the fact that it be more than mere reception of benefits and partake of the character of reliance upon the receipt of the care, service or favor, in whatever quantity it may be." *Id.* at 193 (citing *Turon v. J. & L. Construction Co.,* 8 N.J. 543, 86 A.2d 192, 200 (1952)).

The court settled on a "partial dependency in a substantial degree" standard that the evidence had to meet and held that there was ample testimony indicating substantial dependence of the parents upon the services of their deceased child. *Id.* at 194. The court said: "Not only were [the decedent's] parents deprived of her probable earnings during her minority (which would have inured to their benefit), but they were also deprived of the reasonable expectancy of contributions of a pecuniary nature which decedent might have made after reaching her majority." *Id.* at 195.

A Tenth Circuit case from 1943 seems to equate partial dependence with substantial dependence. In *Myers v. Pacific Greyhound Lines,* the appellant instituted an action against Pacific Greyhound to recover under New Mexico's wrongful death statute for the death of her unmarried twenty-two year old brother. 134 F.2d 457 (10th Cir.1943). For about a year-and-a-half prior to his death, the brother regularly sent his sister $20.00–$35.00 per month in cash, and prior to that, he sent her money intermittently. The deceased also purchased clothes for his sister and shortly before his death, promised that he would continue to support her. The decedent's sister was married at the time of her brother's death, but the joint income of the sister and her husband was insufficient to support them.

Because the Supreme Court of New Mexico had not dealt with the question of the degree of dependence required for recovery under the wrongful death statute, the Tenth Circuit looked to workmen's compensation cases for help in determining what level of dependence would be sufficient for recovery. *Id.* at 458. The Tenth Circuit noted that "[i]n Massachusetts, Georgia, and Washington, each having a death statute similar [to] but not identical with that in New Mexico, it is well settled that *partial or substantial dependence is enough.*" *Id.* at 459 (emphasis added). The court quoted from a New Mexico Supreme Court case interpreting "dependency" within the context of the Workmen's Compensation statute:

> Dependency does not necessarily depend upon whether or not the claimants could support themselves without the earnings of the deceased or whether they could have so reduced their living expenses that they could have been supported independent of such earnings. To the contrary, it depends upon whether or not the deceased had actually contributed to their support and whether or not they relied upon such earnings in whole or in part for their livelihood.

*Id.* (quoting *Gonzales v. Chino Copper Co.*, 29 N.M. 228, 222 P. 903, 905 (1924)).

The Tenth Circuit acknowledged (as we do) that the Workmen's Compensation Act is to be liberally construed, whereas wrongful death statutes are in derogation of the common law and must be strictly construed. *Id.* at 459. Where "dependence" was not defined in the New Mexico wrongful death statute, however, the Tenth Circuit concluded that partial, substantial dependence of a sister and substantial contributions to her support would suffice. *Id.* Although her husband was legally obligated to support the decedent's sister, the court held that the sister's dependence on her husband did not defeat her right to recover if she was also dependent on her brother. *Id.* at 460.

In *Estes v. Schulte,* 146 Wash. 688, 264 P. 990, 991 (1928), a woman, sixty-two years of age, with no means of support and unable to cook or do heavy housework, was found to be

substantially dependent on her deceased sister, who gave her between $20—$25 per month.

"The cardinal rule of statutory interpretation is to ascertain and give effect to the intention of the Legislature." *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999). If, as here, the words "are susceptible to more than one meaning, it is necessary to consider their meaning and effect 'in light of the setting, the objectives and [the] purpose of the enactment.'" *Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 137, 699 A.2d 434 (1997) (citing *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986)). "In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Tucker,* 308 Md. at 75, 517 A.2d 730. "Moreover, in deciding what a term's ordinary and natural meaning is, [a court] may, and often [does] consult the dictionary." *State Dep't. of Assessments & Taxation v. Maryland–National Capital, Park & Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690 (1997).

In 1997, the General Assembly amended Maryland's Wrongful Death Statute by its enactment of House Bill 770. In a wrongful death action without a beneficiary or claimant who is a spouse, parent, or child of the deceased, this bill lowered from "wholly" to "substantially" the degree to which a person related to the deceased by blood or marriage must have been dependent to be entitled to damages. This evidenced a clear intent to make it easier for secondary beneficiaries to recover damages in a wrongful death action.

The only relevant legislative history that we have been able to find regarding House Bill 770 consists of a letter from the Stephanie Roper Committee[2] containing the comments of

---

**2.** The Stephanie Roper Committee is an organization that lobbies for passage of victims' rights laws; it also endeavors to help victims understand their rights.

Roberta R. Roper, Chairman of the Committee, and Russell P. Butler, Esq., the Committee's lawyer. The section of the letter concerning secondary beneficiaries states:

> Under Courts Article, Section 3–904(b), if there is no spouse, child, or parent of the decedent, a person related to the decedent by blood or marriage may claim economic damages if the beneficiary was wholly dependent upon the deceased. [In regard to the term] [w]holly dependent [, the Court of Appeals has said:]
>
>> We hold the rule to be applied to test whether proof of other property and/or income of various kinds prevents a person from being 'wholly dependent' on another is as follows: Total dependency exists where the dependent subsists entirely on the income of the deceased; but, in applying this rule courts will not deprive claimants of the rights of total dependents. when otherwise entitled thereto, on account of temporary gratuitous services rendered them by others, or on account of other minor considerations or benefits which do not substantially modify or change the general rule as above stated. In other words the individual has no consequential source or means of maintenance other than the income of the deceased. *McKeon v. State for Use of Conrad*, 211 Md. 437, [445], 127 A.2d 635 (1956).
>
> The Task Force[3] recommends amending the statute to allow a claim for economic damages if the family member is *substantially dependent*. Assume a person raising a grandchild is killed and the decedent has no spouse, child, or parent. If the grandchild received Social Security or Criminal Injuries Compensation benefits, the grandchild would be unable to claim the loss of economic benefits from the loss of the grandparent as the child would not have been wholly dependent on the grandparent. In this instance, as there would otherwise be no economic or noneconomic damages, the Task Force believes it is appropriate to compensate the

---

**3.** The Task Force refers to a two member Task Force appointed by the General Assembly.

grandchild victim for any economic loss proven as a result of the wrongful death.

Testimony on House Bill 770, Stephanie Roper Committee, Inc. (Feb. 27, 1997) (emphasis added).

*Black's Law Dictionary* defines "substantial" as: "Of real worth and importance; of considerable value; valuable.... Something worthwhile as distinguished from something without value or merely nominal." *Black's Law Dictionary* 1428 (6th ed.1990). The American Heritage College Dictionary defines "substantial" as: "Considerable in importance, value, degree, amount, or extent." *American Heritage College Dictionary* 1354 (3d ed.1997).

■ Edward Stoneberger, Mary Stoneberger, and Candi Blessing were living together as a family unit prior to the subject accident. Mr. Stoneberger's disability benefits constituted 36% of the total "family" earnings, and were used to pay a portion of the family's fixed costs. Mary Stoneberger's benefits constituted 39% of the total income, and Candi Blessing's benefits constituted 24% of the income. Total fixed monthly costs for the family came to $964. Without Mr. Stoneberger's contribution of $527, Mary Stoneberger and her daughter, Candi, had a combined monthly income of only $934.

The Stoneberger household illustrates the fact that three people united under one roof can live, proportionally, more cheaply than two. If one person moved out, the only fixed cost that would decrease is the grocery bill. While the monthly grocery bill would presumably decrease by $200 (1/3 of $600) the contributions to the family unit by any one of the three exceeded that amount. In Edward's case, his contribution was more than two and one-half times more than his pro-rata share of the cost of groceries. In a practical sense, each of the individuals were dependent on each other because if any of the three were to leave, fixed costs would decrease, but not nearly as much as total family income.

In a number of important ways the economic situation in the Stoneberger household (before Edward's death) is analogous to that which exists in many two and three income families. If

the members pool their money and if one family member dies or decides to leave the family unit, the usual result is that the remaining family member(s) suffer financially. This phenomenon is seen everyday in domestic relations practices involving childless marriages where both spouses earn an equal amount and pool their earnings. The reason is the same, *i.e.*, economies of scale. In other words, the fixed costs of the spouse who is abandoned is not reduced as much as the earnings withdrawn from the pool. The result is ofttimes devastating because the disposable income of each spouse is greatly decreased, while expenses remain nearly constant.

Using the dictionary definitions of "substantial," Edward Stoneberger's contribution to both his sister and niece can be said to be of real worth and considerable value.

Appellant argues:

[T]here was no testimony regarding "substantial dependence" other than contributions every third month, by Eddie, to the joint household expenses. This would be offset by the contribution he received, two out of three months, from them.

We disagree for two reasons. First, the decedent paid more than his proportionate share of the fixed expenses. More important, because three can live significantly cheaper, collectively, than one, they all benefitted one another greatly. This constituted sufficient evidence to enable the jury to find that Mary's and Candi's dependence on the deceased was substantial.

Appellant also argues that under 42 U.S.C. section 421(f) (2001), social security benefits for disability cannot be shared, that the funds are "individual" and "able to be used only by the claimant." Appellant contends that "because Social Security disability benefits are intended for the person who is disabled and cannot be utilized for their dependents, the sister and niece of the deceased Eddie Stoneberger could not legally be substantially dependent on him...."

"[T]he primary objective [of the disability insurance aspects of the Social Security system is] to provide workers and their

families with basic protection against hardships created by the loss of earnings due to illness . . . ." *Doe v. Heckler*, 568 F.Supp. 681, 683 (1983) (quoting *Mathews v. deCastro*, 429 U.S. 181, 185–86, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976)). The Old Age, Survivors, and Disability Insurance Act, established under Title II, is an earnings-based insurance program funded by wage earners and is set up as a trust fund administered by the Social Security Administration. *Id.* The Act "was intended to benefit its recipients and not the states in maintenance of their public assistance programs." *Id.* at 684.

Appellant relies upon 42 U.S.C. section 421(f), which reads as follows:

> (f) Use of funds by State. All money paid to a State under this section shall be used solely for the purposes for which it is paid; and any money so paid which is not used for such purposes shall be returned to the Treasury of the United States for deposit in the Trust Funds.

 "Where statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." *Degren v. State*, 352 Md. 400, 417, 722 A.2d 887 (1999). "In such circumstances, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation." *Maryland Div. of Labor and Indus. v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 421, 784 A.2d 534 (2001) (quoting *Giant Food, Inc. v. Dept. of Labor*, 356 Md. 180, 189, 738 A.2d 856 (1999)).

The federal statute relied upon by appellant in her motion for judgment is clear and unambiguous. It does not provide, as appellant contends, that social security benefits for disabled persons cannot be shared. Based on a plain reading of the statute, money paid to a state by the federal government is to be "used solely for the purposes for which it is paid," meaning that federal funds paid to the state that are earmarked for social security disability benefits payments may be used only

for disability benefits payments. Any excess of funds after distribution of payments are to be returned to the United States Treasury. 42 U.S.C. § 421(f). Under this statute, if a recipient of disability benefits wanted to do so, he or she could give to a relative, or any other person, every cent received in disability payments without violating 42 U.S.C. § 421(b).

### ISSUE 2: Whether the Trial Court Erred in Failing to Instruct the Jury Concerning the Duty, or Lack There-of, Owed to a Trespasser

 After the trial judge instructed the jury, the following exchange occurred at the bench:

[COUNSEL FOR APPELLANT]: I submitted an instruction on trespass, which the court did not give. Is the court still of the mind not [to] give it? All right, I would except to that.

The instruction that appellant asked to be given is not in either the record or the record extract. In *Hollingsworth & Vose Co. v. Connor*, 136 Md.App. 91, 764 A.2d 318 (2000), we said:

In reviewing the propriety of a trial court's denial of a requested instruction, we must examine "whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence in front of the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." Moreover, the standard for reversible error places the burden on the complaining party to show both prejudice and error.

*Id.* at 115, 764 A.2d 318.

There is no way for us to determine if the requested instruction was "a correct exposition of the law." *See, e.g., Kassama v. Magat*, 368 Md. 113, 131–33, 792 A.2d 1102 (2002) (providing an example of the importance of knowing precisely what instruction was requested). The issue was not, therefore, preserved for our review.

### ISSUE 3: Whether Sufficient Evidence Was Presented to Support a Finding That Edward Stoneberger En-

**dured Conscious Pain and Suffering as a Result of the Subject Accident**

This issue likewise has not been preserved for appellate review. During trial, there was testimony regarding conscious pain and suffering and whether Edward Stoneberger experienced it. None of this testimony was objected to by appellant. Appellant's counsel made no motion in regard to the "pain and suffering" issue and did not except to the trial court's instruction to the jury regarding damages for the decedent's conscious pain and suffering.

At oral argument before this Court, counsel for the appellant was asked whether this issue was preserved for appellate review. Appellant's counsel replied that he had preserved the issue by making a motion for judgment at the conclusion of the trial. Counsel's motion, however, made no reference to conscious pain and suffering. *See* Md. Rule 8–131(a) (except for jurisdictional issues, an appellate court does not ordinarily decide issues that were not raised or argued below).

**ISSUE 4: Whether the Trial Court Erred in Accepting Roger Campbell as an Expert Concerning the Subject of Occupational Safety and the Operation of Cranes**

The standard for admissibility of expert testimony in Maryland is set forth in Maryland Rule 5–702. Expert testimony is admissible if the court determines that the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. In making that determination, the court must determine "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

*Buxton v. Buxton,* 363 Md. 634, 650, 770 A.2d 152 (2001).

"[I]t is within the sound discretion of the trial judge to determine the admissibility of expert testimony and ... the trial court's action in the area of admission of expert testimony seldom provides a basis for reversal." *Id.* at 651,

770 A.2d 152. The broad discretion of the trial judge "will not be disturbed on appeal absent an error of law or fact, a serious mistake, or clear abuse of discretion." *Johnson & Higgins of Pennsylvania, Inc. v. Hale Shipping Corp.*, 121 Md.App. 426, 444, 710 A.2d 318 (1998). "[O]bjections attacking an expert's training, expertise, or basis of knowledge go to the weight of the evidence and not its admissibility." *Id.*

■ Appellant's present criticisms of Mr. Campbell's expertise are four in number: (1) As an agent of the Maryland Occupational Safety and Health Department ("MOSH"), he inspected the accident site to determine if Mr. Ditto violated MOSH requirements that he provide a safe workplace for employees—but, inasmuch as Edward Stoneberger was not an employee, he "did not investigate the Stoneberger accident"; (2) he has never operated a crane; (3) he had never worked in the demolition business; and (4) he was not present at the time of the accident.

Prior to allowing Mr. Campbell to testify as an expert, the following facts relevant to Mr. Campbell's expertise were established:

The witness was a graduate of the University of Southern California Safety Center and has a Masters of Science degree in Safety Studies; he has been certified as a safety professional and was at the time of trial a hazard control manager; he had twenty-six years of work experience in safety; he has worked for MOSH as a compliance specialist since June 1992. On behalf of MOSH, he had the responsibility for conducting "complex ... accident investigations, [and] employee complaints." When he first commenced working for MOSH, he attended approximately 120 hours of classroom instruction and seminars concerning cranes put on by Grove Cranes (manufacturers of cranes and other lifting equipment) and by one Bob Smith, a former employee of MOSH who was MOSH's "resident crane expert." He has also attended a class on loading at Catonsville Community College.

At trial, counsel for appellees said: "Your Honor, I tender Mr. Campbell as an expert with regard to occupational safety

and for the purpose of this case specifically regarding to the use of operational cranes, which effected demolition activities in construction relative to demolition." Appellant's counsel objected, saying: "Objection, your Honor. Mr. Campbell has already said he wasn't investigating this accident." Counsel for appellant thereafter asked Mr. Campbell several questions, concerning his qualifications, which were followed by additional questions by appellees' counsel. The court then said he would receive Mr. Campbell "as an expert in occupational safety" and as an expert in the "operation of cranes." Counsel did not note an objection to that designation at the time the court made its decision or at any time thereafter, except on two occasions that will be discussed *infra*.

Mr. Campbell testified that as part of his MOSH investigation he spoke with Mr. Ditto at the accident scene. During this July 27, 1998, conversation, Mr. Ditto described how he used the crane to demolish the building. He told Mr. Campbell that he manipulated the boom of the crane itself against the structure to bring it down. Mr. Ditto demolished the feed mill without a demolition plan and could not produce a documented engineering survey for the demolition. According to Mr. Campbell, an engineering survey is required by law and is necessary to ensure that one's employees are not underneath areas where building floors or walls or other attachments might be weakened.

During Mr. Campbell's direct testimony, the following exchange occurred:

Q. Mr. Campbell, based on your knowledge, training and experience, is utilization of the crane in the manner described by Mr. Ditto a proper use, a misuse or a proper use under any circumstances.

[APPELLANT'S COUNSEL]: Objection. He's not a crane operator.

THE COURT: Overruled.

[APPELLEE'S COUNSEL]: You can answer.

A. I think it would be an improper use.

Q. And why do you say that?

A. This was an eight ton crane. All ... all capacities and ratings on cranes are based upon a freely suspended load hanging on either a wire rope or other appropriate tangents or connections. Any time that you start dragging or pushing the boom then you're imposing side load. Cranes fail basically for two reasons: They're either A.— overloaded or [B.] you have side loads applied. That's the main reason for boom failures, equipment failures in cranes.

Q. ... I direct your attention specifically to the building that's being worked on material in that building. What are the dangers associated with using the boom in the fashion that Mr. Ditto described?

[APPELLANT'S COUNSEL]: Repeat objection.

THE COURT: Overruled.

A. If you lost the boom it could come crashing down and you wouldn't know what was going [to] ensue afterwards and things could start flying around maybe, maybe not.

Q. Is there any way to control the materials in the building when you utilize a boom like that?

A. Not that I can see.

Q. How would one control a big steel pipe that is ... that was described in this case?

[APPELLANT'S COUNSEL]: Objection, your Honor. That is speculative. No foundation.

THE COURT: Overruled.

Q. What methods could you use to control?

A. This comes back to your engineering ... your engineering survey more than it does to the crane. You're required in your engineering survey to make provisions where your employees are not underneath deteriorated walls or other attachments to the building or floors or walls or other attachments that might be weakened or loosened. If you have those then you are required to brace them, shore them or use some other effective means to control that so that it can't hit your employees so your employees aren't exposed to the hazards of falling material or falling through say a weakened or deteriorated floor.

In regard to the foregoing evidence, the only issue preserved for review concerning Mr. Campbell's expertise, is whether the trial judge erred in overruling the objection to two questions based on counsel's objection that Mr. Campbell "was not a crane operator."

 "[T]he mere fact that a person offered as a witness has not been personally involved in the activity about which he is to testify does not, as such, destroy his competency as an expert." *Radman v. Harold,* 279 Md. 167, 170, 367 A.2d 472 (1977) (allowing an internal medicine specialist to express an opinion on the performance of a hysterectomy even though he had never performed one). In *Rotwein v. Bogart,* 227 Md. 434, 177 A.2d 258 (1962), the Court of Appeals explained the reason for this rule:

> We do not agree entirely with the court's first reason, that the witness could not qualify as an expert in the flooring trade as he had never previously laid a floor. A witness may qualify if he possesses special and sufficient knowledge regardless of whether such knowledge was obtained from study, observation or experience. A law professor may be an expert on trial procedure even though he has never tried a case. There are many expert astronauts who have yet to make a space flight.

*Id.* at 437, 177 A.2d 258 (citation omitted).

In light of Mr. Campbell's extensive training in the field of safety, coupled with his 120 hours training concerning cranes and his on-the-job experience with MOSH, the fact that he had never personally operated a crane did not disqualify him as an expert in the operation of cranes. We therefore hold that the trial judge did not abuse his discretion in allowing Mr. Campbell to testify as an expert.

Although the questions are not listed as questions presented in appellant's brief, several other arguments are made by appellant concerning Mr. Campbell's testimony. For instance, appellant says Mr. Campbell was allowed to "blurt out hearsay information." Counsel for appellant does not say specifically what "hearsay information" he is complaining about, and the

record extract reference made by appellant directs us to a page in the record extract containing no hearsay "blurt." The only objection (on the page to which appellant makes reference) was made when the witness was about to summarize a letter. That objection was *sustained,* and there was no motion to strike the question. This can scarcely be considered trial court error. *See, e.g., Braun v. Ford Motor Co.,* 32 Md.App. 545, 548–49, 363 A.2d 562 (1976). Additionally, appellant complains that none "of [Mr. Campbell's] testimony was asked with respect to 'reasonable certainty in the demolition area.'" But, appellant fails to explain why all questions to the expert should have been phrased in that manner. As Judge Rodowsky said in *Mayor & City Council of Baltimore v. Theiss,* 354 Md. 234, 262, 729 A.2d 965 (1999):

> An expert opinion that is not rendered with reasonable certainty or reasonable probability is not necessarily inadmissible. For example, the opinion may be admissible when, in conjunction with additional evidence, the combination amounts to sufficient probable proof of causation. *Charlton Bros. Transp. Co. v. Garrettson,* 188 Md. 85, 94, 51 A.2d 642, 646 (1947) ("The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc,* [*ergo* ] *propter hoc* is a recognized logical fallacy, a *non sequitur.* But the sequence of events, plus proof of *possible* causal relation, may amount to proof of probable causal relation, in the absence of evidence of any other equally probable cause.").

*Id.* (Rodowsky, J., concurring).

Additionally, appellant argues:

> [Mr. Campbell] was also allowed to testify that the crane could not pass inspection. . . . There was no showing that the lack of inspection of the crane had anything to do with this accident and the testimony resulted in a prejudice against Mr. Ditto.

At trial, Mr. Campbell was asked: "Based on your knowledge, training, and experience would this particular crane have passed inspection?" Appellant's counsel objected, and

the objection was overruled. Mr. Campbell then answered the question in the negative. Later, without objection, he explained why the crane would not have "passed inspection."

It is true that the condition of the crane was irrelevant, and therefore appellant's objection should have been sustained. But appellant does not explain how Mr. Campbell's negative response to that single question prejudiced her, and we do not perceive any prejudice. *See Bradley v. Hazard Technology Co., Inc.,* 340 Md. 202, 206, 665 A.2d 1050 (1995) (to succeed on appeal, an appellant must prove not only error but prejudicial error).

### ISSUE 5: Whether the Trial Court Erred in Allowing Counsel for the Appellee to Use Misleading Photographs

There were two photographs of the construction site that came into evidence. Each photograph was identified and authenticated by a different witness. First, Randy Schroyer, who was present when the accident occurred, testified as to a photograph marked plaintiff's Exhibit 11. When asked if Exhibit 11 accurately depicted the intersection of Railroad Lane and Main Street, appellant's counsel objected (in the presence of the jury) "because this was taken after ... a day or some day after the accident." The trial judge retorted, also in the jury's presence:

> Well, I think with the understanding as to when it was taken, I'll permit it. The jury understands ... I mean the explanation and foundation will be laid as to when this was and if there had been any changes made from the time that the accident occurred.

Mr. Schroyer next noted "that there were things missing" from the photograph. He used Exhibit 11 to show the jury where the crane was located and where he was standing when the accident occurred. Exhibit 11 was then admitted into evidence over appellant's objection. Exhibit 11 does not show any barricades or "no trespassing" signs.

On cross-examination by appellant's counsel, Mr. Schroyer said that (1) there *were barricades* up on the day of the

accident, (2) "no trespassing" signs *were placed* in the window of the feed mill building, and (3) when the accident occurred, the brownstone house across Railroad Lane from the demolition site *had a no trespass sign in the window.*

 Appellant now argues that Exhibit 11 was "extremely misleading because . . . [it] showed the scene, which was depicted as being reliable, but did not show any barricades, caution tape or signs." This argument, in light of all of Mr. Schroyer's testimony, coupled with what the judge said in the presence of the jury immediately before Exhibit 11 was admitted, is without merit because it is impossible to see how the jury could have been misled.

The Mayor of Smithsburg, Thomas Bowers, was asked whether Exhibit 12 fairly and accurately depicted the intersection of Railroad Lane and Main Street at the time of the accident. Mr. Bowers responded that it did. Exhibit 12 was then admitted without objection. Appellant now contends that Exhibit 12 should have been excluded because it was "highly misleading." [4] This contention has not been preserved. *See* Md. Rule 8–131(a).

### ISSUE 6: Whether the Trial Court Erred in Allowing Patsy Hays, the Caregiver for the Deceased, Mary Stoneberger, and Candi Blessing, to Introduce Social Security Administration Records

 Social security disability benefit records were offered into evidence immediately before Patsy Hays took the stand. Appellant's counsel objected, arguing that the records had not been properly authenticated. The trial court asked appellee's counsel for his assurance that the records came directly from the Social Security Administration; upon receipt of that assurance, the court admitted the records.

---

4. On cross-examination, Mr. Bowers admitted that since he was not at the accident site at the precise moment when the accident occurred, he could not say whether there were barricades or tape blocking Railroad Lane at that time.

The records were not authenticated and should not have been admitted. We agree with appellant that the trial court erred. In her brief, appellant devotes only a part of one sentence to the issue of the prejudicial effect of that error, *viz:* "The records were improperly admitted *and poisoned the defense of this case.*" (Emphasis added.) Appellant did not support the "poisoned" conclusion with any argument or explanation.

All the information concerning the amount of payments to Mary, Candi, and the deceased contained in the social security records subsequently came in during Patsy Hays's testimony, and was not objected to by appellant. Thus, the records were duplicative of evidence subsequently received. When inadmissible evidence is admitted over the objection of appellant and the same evidence is subsequently admitted without objection, the error is not considered prejudicial. *S & S Building Corp. v. Fidelity Storage Corp.,* 270 Md. 184, 190, 310 A.2d 778 (1973); *see also Jones v. State,* 205 Md. 528, 534–35, 109 A.2d 732 (1954); *Linkins v. State,* 202 Md. 212, 214, 96 A.2d 246 (1953).

**JUDGMENT AFFIRMED; COST TO BE PAID BY APPELLANT.**